551 F.2d 432
 10 ERC 1043, 179 U.S.App.D.C. 246, 7
Envtl. L. Rep. 20,306
 AMERICAN HORSE PROTECTION ASSOCIATION et al., Appellants,
v.
UNITED STATES DEPARTMENT OF INTERIOR et al.
The AMERICAN HORSE PROTECTION ASSOCIATION, Virginia
Non-Profit Corporation, et al.
v.
UNITED STATES DEPARTMENT OF INTERIOR et al., Appellants.
 Nos. 75-1033 and 75-1196.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 14, 1976.
Decided Feb. 2, 1977.
 
 Robert C. McCandless, Washington, D. C., for appellants.
 Dirk D. Snel, Atty., Dept. of Justice, Washington, D. C., with whom Wallace H. Johnson, Asst. Atty. Gen., Dept. of Justice, Earl J. Silbert, U. S. Atty., Robert M. Werdig, Jr., Asst. U. S. Atty., Edmund B. Clark and John E. Lindskold, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees.
 Before BAZELON, Chief Judge, and TAMM and ROBINSON, Circuit Judges.
 Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 In 1971, Congress enacted the legislation known as the Wild Free-Roaming Horses and Burros Act[1] to preserve the primeval status of "all unbranded and unclaimed horses and burros on public lands of the United States".[2] Declaring that these creatures are "living symbols of the historic and pioneer spirit of the West"[3] and finding that they "are fast disappearing from the American scene",[4] Congress proclaimed that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death."[5] The Act is administered by the Secretary of the Interior through the Bureau of Land Management and by the Secretary of Agriculture through the Forestry Service with respect to animals on public lands respectively superintended by them.[6]
 
 
 2
 The Act confers upon the Secretaries broad powers and imposes upon them various duties designed to effectuate the legislative objectives.[7] The Act brings "(a)ll wild free-roaming horses and burros . . . under the jurisdiction of the Secretar(ies) for the purpose of management and protection . . . ."[8] The Secretaries are directed to maintain sanctuaries for the animals after consultation with state wildlife agencies and advisory boards established under the Act.[9] The animals are to be managed "in a manner that is designed to achieve and maintain a thriving ecological balance on the public land."[10] The Secretaries are authorized, after consultation with the advisory board, to destroy animals in a humane fashion when necessary because of overpopulation.[11] The Act also permits the Secretaries to enter into cooperative agreements with state and local agencies and private individuals, and to issue "such regulations as (they) deem( ) necessary for the furtherance of the purposes of the (Act)."[12]
 
 
 3
 The Act defines "wild free-roaming horses and burros" as "all unbranded and unclaimed horses and burros on public lands of the United States."[13] Since not all horses and burros on public ranges fall within that definition, Congress left the door open to individual assertions of ownership of animals thereon. The Act specifies, however, that "(a) person claiming ownership of a horse or burro on the public lands shall be entitled to recover it only if recovery is permissible under the branding and estray laws of the State in which the animal is found."[14] The question presented by this appeal is whether the determination of ownership under state law is ultimately to be made by federal or by state officials.
 
 
 4
 * Appellants[15] initiated an action in the District Court against appellees,[16] alleging violations of the Act and other federal statutes[17] in connection with a roundup of horses on federal lands. The action sought injunctive and declaratory relief and damages as well. The record, reinforced by the court's factual findings, vividly portrays the basic and often sordid events precipitating the litigation.
 
 
 5
 In January and February, 1973, there was a roundup of horses, alleged by appellants to be wild and free-roaming, on public lands near Howe, Idaho.[18] The roundup was organized and conducted by ranchers, who did not have written authorization from federal authorities[19] although they had discussed the roundup with officials of the Bureau of Land Management.[20] Appellees have maintained throughout that the horses are not wild and free-roaming within the meaning of the Act, and that the ranchers were at liberty to go onto federal property to recover them as their animals.[21]
 
 
 6
 The circumstances accompanying the roundup are recounted in an investigative report prepared jointly by the Bureau and the Forestry Service.[22] Two attempts to round up the horses were made with the aid of a helicopter in January, 1973, but the efforts failed.[23] Further unsuccessful attempts were later made to "haze the horses into a corral" by use of an airplane.[24] Six horses were captured in yet other attempts between January 20 and February 10, 1973. Two of these horses were consigned to an individual who "(a)fter being notified that these might be government protected horses . . . castrated the two horses. . . ."[25]
 
 
 7
 "During the period February 17-19, 1973," the record reveals, "approximately 21 horses were trapped in a high rimrock area" by several of the ranchers.[26] The animals were left unattended overnight while the ranchers discussed with a veterinarian means of controlling them, and were informed that the best way was to "partially close their nostrils with hog rings."[27] On the morning of February 19, when the ranchers returned to the area, "they found that four horses had fallen over a 40 foot cliff to their death. Three other horses had caught their hooves in the rocks,"[28] and efforts to free them proved unavailing. "Therefore," we are told, "they disposed of the three by cutting their throats and pushing the bodies over the cliff. In all, seven horses met their death at the trap area."[29] In the week that followed, another 20 horses were captured, but "three horses broke their legs while attempting to avoid capture" and were shot.[30] After the roundup, the horses surviving were shipped to Nebraska to be slaughtered for dog food. Some died en route, but those remaining alive were rescued and returned to Idaho to be cared for by the Bureau pending a determination of ownership.[31]
 
 
 8
 After appellants' lawsuit was instituted, claims to the horses were submitted to the Bureau by individuals asserting ownership, and by two members of Congress[32] insisting that the horses were wild and free-roaming.[33] A determination on ownership of the animals was made by the Idaho State Brand Inspector pursuant to a cooperative agreement between the state, the Bureau and the Forestry Service.[34] Rejecting without comment the view of the Idaho Attorney General's office that it was unlikely that private ownership of the horses could be established under Idaho Law,[35] the Brand Inspector held that none of the horses was wild and free-roaming.[36]
 
 
 9
 In reaching this conclusion, the Brand Inspector made no determinations of ownership as to any of the horses. This no doubt is explained by the fact that he was not presented with any evidence of individual ownership. None of the horses involved in the roundup had been branded, and there were no bills of sale identifying particular horses.[37] The only bills of sale adduced had been gathered from ranchers in the area at the time of the roundup from "all . . . persons who might conceivably have owned horses in the area."[38] These bills of sale did not identify specific animals, and were based on indicia of ownership which may charitably be described as sketchy. The claim of seller-ownership underlying one bill of sale for six unbranded horses plus offspring, for example, was "based upon a stallion and a mare that (were) lost in the area in 1951."[39] Another bill of sale, for seven to ten branded horses, was given by a rancher whose alleged ownership was "based upon a possibility that some of his horses may have escaped from his ranch prior to (his) selling it . . . in 1970."[40]
 
 
 10
 In lieu of individual determinations of ownership, the Brand Inspector decided only that at some time in the past the animals had belonged to someone and accordingly were not wild. He reasoned that about seven of the horses[41] were not wild because, as depicted in photographs, they were gelded and therefore at one time were domestic animals or were pictured near gelded horses, a circumstance which he took as an indication that they had been domesticated since, he said, only horses which were raised together would stay together.[42] With respect to the remaining horses, living and dead, the Brand Inspector concluded they must have been domesticated because for many years the ranchers in the area had turned their horses loose on the public lands and after the last roundup in 1964 there were only nine or ten horses left on the range.[43] Finding no evidence that those horses had been abandoned, the Brand Inspector concluded that the 50 to 55 horses gathered in the roundup were not wild, and awarded ownership of them to the holder of the bills of sale.[44]
 
 
 11
 After the Brand Inspector's opinion issued, a conference was held in the District Court at which the parties discussed the effect of the decision on the suit. The record discloses that appellants "agreed that if the Idaho State Brand Inspector had proper authority under the Act to determine the claims to the horses, then their case had to be dismissed."[45] The court then granted summary judgment for appellees, rejecting appellants' contention that the Brand Inspector lacked authority under the Act to determine ownership conclusively.[46] This appeal followed.[47]
 
 II
 
 12
 Section 5 is the Act's only provision on the matter of private claims to animals ostensibly under statutory protection. "A person claiming ownership of a horse or burro on the public lands shall be entitled to recover it," Section 5 ordains, "only if recovery is permissible under the branding and estray laws of the State in which the animal is found."[48] While the statutory text makes plain that state substantive law governs the validity of ownership claims, it does not answer the question of whether the decision is to be made by state or by federal officials.
 
 
 13
 Nor does any other provision of the Act indicate a reliable answer. At some points, the statute specifies that the Secretaries are to act only after consultation with state officials,[49] but nowhere is any decision-making power conferred exclusively upon state officials. Since the Act does not within its four corners define the proper roles of state and federal officials under Section 5, we seek guidance from its purpose, its legislative history and its administrative construction.[50]
 
 
 14
 Congress has articulated in no uncertain terms the concerns that led to passage of the Act. It found "that the wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."[51] Congress has proclaimed as its policy "that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death."[52] "And to accomplish this," Congress has declared that "they are to be considered in the area where presently found, as an integral part of the natural system of the public lands."[53]
 
 
 15
 The reason why a federal law was deemed essential to achievement of these purposes was made clear by testimony during hearings on the forerunning bills to preserve the remaining wild free-roaming horses and burros.[54] Several witnesses voiced the opinion that there was need for comprehensive federal legislation because of the inability or disinclination of the states to protect these animals.[55] Representative Wolff, one of the sponsors of the legislation, told the House subcommittee:
 
 
 16
 For several decades, most Americans have remained silent as many of our native species including the American bald eagle have been virtually destroyed. Now thousands of citizens, including those in my own Congressional District, are asking the Congress to provide protection for the wild horse, symbol of the West and of the pioneer spirit of America. It is clear that Federal legislation will be necessary if we are to achieve that purpose the States have either failed to pass or have been lax in enforcing legislation to protect wild horses and burros, because of pressure from cattlemen and other groups who seek elimination of the animals on grounds that they are a menace to their grazing rights on Federal lands.[56]
 
 
 17
 Senator Nelson, also a sponsor, testified before the Senate subcommittee in a similar vein:
 
 
 18
 Federal legislation is urgently needed to protect the remaining wild horses and burros not only because they are threatened with possible extinction, but also due to the fact that states have been notoriously lax in protecting these animals.[57]
 
 
 19
 Utilizing these expressions of dissatisfaction with state regulation, as their base, appellants argue that Congress would not have committed the all-important Section 5 decision to those who it was told were no more than lukewarm on the legislative objective.
 
 
 20
 Appellees, on the other hand, rely on statements in the House and Senate committee reports in support of the District Court's decision. They point to the discussion of Section 5 in the Senate report:
 
 
 21
 A basic difficulty in determining the intended scope of the legislation is the definition of what constitutes a wild free-roaming horse or burro. Particular concern was expressed by witnesses during the hearing that the original text of S. 1116[58] did not recognize claims by individuals to ownership of unbranded horses or burros on public lands. Addition of the word "unclaimed" in the definition of a wild free-roaming horse or burro serves to give recognition to the valid claims of individuals. In addition, a new Section 5 was added to emphasize the ability of an individual to prove ownership of a horse or burro on the public lands under the branding and estray laws of the State in which it is found. It is certainly not the intent of the committee that the right of an individual to claim and prove ownership under the respective State branding and estray laws be abrogated, nor that the appropriate State or local body should not exercise their statutory authority and obligation if the question of private ownership of a horse or burro should be raised.[59]
 
 
 22
 Appellees directed us also to language in the House committee report:
 
 
 23
 During the consideration of this legislation, the committee found that one of the most difficult problems was a means of determining what was a wild free-roaming horse or burro. While relatively easy to define, that is, "all unbranded and unclaimed horses or burros on public lands," this does not, of course, make actual field identification of a specific animal either positive or easy. Many privately owned animals are unbranded, and merely because of this lack of visible markings the ownership of such animals should not be placed in doubt. In recognition of this problem, the bill provides that any person asserting ownership of a horse or burro on the public lands shall do so in accordance with the branding and estray laws of the State in which it is found. This permits full play of State laws regarding any question of ownership.[60]
 
 
 24
 Although at first blush, these statements might seem to support appellees' position, we think a contrary interpretation of Section 5 is much more strongly indicated. " In determining the legislative intent, our duty," we have explained, "is to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment, particularly where . . . that interpretation is consistent with the plain language of the statute."[61] Applying this canon to the legislation before us, we are led to the conclusion that the authority to make Section 5 determinations is not confided exclusively to state authorities.
 
 
 25
 As we have noted, Congress was gravely concerned both as to the ability and the willingness of the states to promote the survival of wild free-roaming horses and burros.[62] Indeed, that very uneasiness shaped the congressional judgment that federal management of those on federal lands was essential to their conservation.[63] Since animals successfully claimed under state branding and estray laws lose the benefits and safeguards afforded by the Act,[64] the decision as to whether particular animals are wild or domesticated is obviously crucial. A state vulnerable to "pressure from cattlemen and other groups"[65] could defeat the congressional purpose by the simple expedient of decisional practices greatly facilitating if not assuring the success of ownership claims to animals on federal property.[66] That, as the legislative history suggests, state officials are to play some part in the decision-making process[67] is not at all inconsistent with reservation of the final decision to the Federal Government. And while Congress might have chosen to disregard warnings about the shortcomings of state regulation,[68] we would need stronger evidence to convince us that Congress was willing to risk the possibility of rendering the Act more or less nugatory by leaving decisions on animal ownership solely and unqualifiedly to state officials.
 
 
 26
 A further and perhaps equally important consideration is the construction given this aspect of the Act over the years by the Secretaries of the Interior and Agriculture and their divisions responsible for its administration. Although as appellees on this appeal they would concede the final ownership determination to the states, they have consistently taken the contrary position in a series of administrative interpretations of the Act. Promptly after the Act passed on December 15, 1971, the Associate Director of the Bureau of Land Management, an appellee here, sent an instructional memorandum to all district managers dictating courses of procedure to be followed during the period prior to promulgation of regulations implementing the Act.[69] That memorandum instructed the managers to assume that all horses on public lands not covered by a license or permit were wild and free-roaming, and to avoid allowance of recoveries by purported owners of claimed animals until the regulations went into effect.[70] If waiting was impossible, a roundup was to be authorized by a document specifying ownership information.[71] But before approving a roundup, managers were to be reasonably sure that the claim to ownership was valid and very significantly, before actually releasing an animal "the claimant must prove ownership to the satisfaction of the district manager."[72] Thus the first interpretation of the Act by an agency charged with its enforcement concluded that federal officials were to have the final say on animal ownership.
 
 
 27
 The next administrative construction of the Act by the Bureau, while not so explicit, was not in the least inconsistent. It came forth on December 20, 1972, about the time the roundup in this case was being planned. That interpretation was embodied in proposed regulations designed to carry out the provisions of the Act.[73] These regulations required that all actions taken in connection with ownership claims were to be coordinated with appropriate state agencies,[74] and staked out specific procedures to be followed with respect to such claims.[75] Under those procedures, the authorized federal officer was to be presented with some proof of ownership by the claimant before the roundup.[76] Following the roundup, but before release of any animal, the claimant had to present to the federal officer a certificate from a state official showing that the claimant had proven ownership of the animal under the applicable state branding and estray laws.[77] While the proposed regulations did not indicate where the final authority for ownership determinations resided, they certainly did not recognize its existence in the hands of the states.
 
 
 28
 The final regulations, published in August, 1973, after the roundup in this case, make the responsibility for the final decision on animal ownership very clear.[78] The regulations require the claimant to first present some substantial indicium of ownership to the authorized federal officer.[79] After a roundup, the federal officer and a state official must together inspect the animal,[80] and the state official then makes a written determination of ownership pursuant to the state's branding and estray laws and any cooperative agreement between the Bureau and the state agency.[81] A copy of the determination is to be filed with the federal officer[82] and, as the regulations explicate, "(n)o animal may be removed from the gathering place until the claim of ownership has been proven to the satisfaction of the authorized officer."[83]
 
 
 29
 A further and later administrative interpretation at odds with appellees' litigative posture is contained in a memorandum dated April 3, 1974, sent to the Bureau's Idaho District Manager by the Bureau's Associate Director.[84] The memorandum specified the procedures to be followed in settling claims to the horses involved in the instant case.[85] It suggested that the State Brand Inspector make his determination, after a hearing if desired,[86] after which the authorized officer of the Bureau, if he agreed with the determination, would so indicate, and submit the determinations to the Director of the Bureau.[87] The memorandum warned that no horses were to be released until after clearance with the Director.[88] Thus another manifestation of the administrative view that the decision on animal ownership is ultimately to be made by federal authorities.
 
 
 30
 With the single exception of the proposed regulations which are silent on the matter,[89] all administrative interpretations of the Act contemplate a final animal-ownership determination by federal authorities. Very importantly, the regulations as ultimately adopted unequivocally give the Act that construction.[90] An administrative interpretation of a statute by an agency entrusted with its administration commands great deference in the courts.[91] "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' "[92] Where the agency is authorized to issue regulations to which Congress has imparted the force of law, as is the case here,[93] its interpretation is entitled to an even larger measure of esteem.[94] And "(t)o sustain the (agency's) application of (the) statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."[95]
 
 
 31
 In sum, we find the District Court's construction of Section 5 unacceptable. We cannot believe that Congress intended to abdicate to state officials final determinations under Section 5 on ownership of wild free-roaming horses and burros on federal lands. In light of the clear purpose of the Act and the consistent administrative interpretation of Section 5, we hold that the final role is reserved to the Federal Government. The judgment appealed from is accordingly reversed, and the case is remanded to the District Court for further proceedings consistent with this opinion.
 
 
 32
 So ordered.
 
 
 
 [1]
 Act of Dec. 15, 1971, Pub.L.No.92-195, 85 Stat. 649, 16 U.S.C. §§ 1331-1340 (Supp. V 1975) (hereinafter "Act"). The Supreme Court has held the Act constitutional. Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)
 
 
 [2]
 Act, § 2(b), 16 U.S.C. § 1332(b) (Supp. V 1975)
 
 
 [3]
 Act, § 1, 16 U.S.C. § 1331 (Supp. V 1975)
 
 
 [4]
 Id
 
 
 [5]
 Id
 
 
 [6]
 Act, § 2(a), 16 U.S.C. § 1332(a) (Supp. V 1975)
 
 
 [7]
 See text infra at notes 8-12
 
 
 [8]
 Act, § 3(a), 16 U.S.C. § 1333(a), provides in pertinent part:
 All wild free-roaming horses and burros are hereby declared to be under the jurisdiction of the Secretary for the purpose of management and protection in accordance with the provisions of this chapter. The Secretary is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands, and he may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation, where the Secretary after consultation with the wildlife agency of the State wherein any such range is proposed and with the Advisory Board established in section 1337 of this title deems such action desirable. The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands. . . . All management activities shall be at the minimal feasible level and shall be carried out in consultation with the wildlife agency of the State wherein such lands are located in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species.
 Act, § 7, 16 U.S.C. § 1337, provides in part:
 The Secretary of the Interior and the Secretary of Agriculture are authorized and directed to appoint a joint advisory board of not more than nine members to advise them on any matter relating to wild free-roaming horses and burros and their management and protection.
 
 
 [9]
 Act, § 3(a), 16 U.S.C. § 1333(a) (Supp. V 1975), quoted in part supra note 8
 
 
 [10]
 Id
 
 
 [11]
 Act, § 3(a), (b), 16 U.S.C. § 1333(a), (b) (Supp. V 1975)
 
 
 [12]
 Act, § 6, 16 U.S.C. § 1336 (Supp. V 1975). The Act also provides criminal penalties (a) for willfully removing wild free-roaming horses or burros from public lands; (b) for converting them to private use; (c) for harassing, causing the death of, or processing any such animal into a commercial product; (d) for selling any such animal directly or indirectly; and (e) for willful violations of regulations issued pursuant to the Act. Act, § 8(a), 16 U.S.C. § 1338(a) (Supp. V 1975)
 
 
 [13]
 Act, § 2(b), 16 U.S.C. § 1332(b) (Supp. V 1975)
 
 
 [14]
 Act, § 5, 16 U.S.C. § 1335 (Supp. V 1975)
 
 
 [15]
 Appellants are the American Horse Protection Association and a member of the joint advisory board created under the Act. The Humane Society of the United States, a plaintiff in the District Court, did not join in this appeal
 
 
 [16]
 Appellees are the Departments of the Interior and Agriculture and officials thereof
 
 
 [17]
 These statutes are The Administrative Procedure Act, Pub.L.No.89-554, 80 Stat. 383, 5 U.S.C. §§ 551 et seq. (1970); the Act of Aug. 27, 1958, Pub.L.No.85-765, 72 Stat. 862, 7 U.S.C. §§ 1901 et seq. (1970); the Act of Aug. 24, 1966, Pub.L.No.89-544, 80 Stat. 350, as amended, 7 U.S.C. §§ 2131 et seq. (1970); the Horse Protection Act of 1970, Pub.L.No.91-540, 84 Stat. 1404, as amended, 15 U.S.C. §§ 1821 et seq. (1970); the Act of Nov. 18, 1971, Pub.L.No.92-159, 85 Stat. 480, 16 U.S.C. § 742j-1 (Supp. V 1975); the Act of Sept. 8, 1959, Pub.L.No.86-234, 73 Stat. 470, 18 U.S.C. §§ 47(a) et seq. (1970); the National Environmental Policy Act of 1969, Pub.L.No.91-190, 83 Stat. 852, 42 U.S.C. §§ 4321 et seq. (1970); the Taylor Grazing Act, Pub.L.No.73-842, 48 Stat. 1269, as amended, 43 U.S.C. §§ 315 et seq. (1970). The posture of the case on this appeal renders unnecessary any present consideration of the possible relationship of these laws to the litigation
 
 
 [18]
 Joint Appendix (J.App.) 134-135
 
 
 [19]
 See note 35 infra
 
 
 [20]
 J.App. 135
 
 
 [21]
 J.App. 135. Even assuming, however, that the horses were owned by the ranchers, the Act and implementing regulations would not permit the ranchers to round them up without first complying with prescribed procedures. See note 34 infra
 
 
 [22]
 J.App. 181-187
 
 
 [23]
 J.App. 183
 
 
 [24]
 J.App. 183
 
 
 [25]
 J.App. 183
 
 
 [26]
 J.App. 184
 
 
 [27]
 J.App. 185
 
 
 [28]
 J.App. 185
 
 
 [29]
 J.App. 185
 
 
 [30]
 J.App. 185. Snowmobiles were also used to round up the horses
 
 
 [31]
 J.App. 135, 186
 
 
 [32]
 They are Senator James G. Abourzek and Representative Gilbert Gude
 
 
 [33]
 J.App. 136
 
 
 [34]
 J.App. 78-91. The joint agreement between the Bureau, the Forestry Service and the State of Idaho was entered into in July, 1973, several months after the roundup at issue in this case. J.App. 255-257. That agreement provides that prior to any roundup of horses, the claimant must submit to the Bureau a sworn affidavit containing designated information concerning the animals claimed. Bills of sale recognized by the state and valid animal-inspection certificates are also to be submitted when available; if they cannot be produced, other indicia of ownership may be accepted. Following the submission, state and federal officials are to meet and review the data and, on the basis of the review, the state officer is to certify to the federal official his opinion as to whether the claimant meets the state's ownership requirements. If he does, the federal official is to issue a written authorization to the claimant to round up the animals. After the roundup, however, the two officials are to examine the animals and, if they are satisfied as to ownership, the animals are to be turned over to the claimant. J.App. 257. The agreement does not indicate what occurs if the state official is satisfied as to ownership but the federal official is not
 
 
 [35]
 J.App. 263-267. The memorandum discusses in some detail the problems incidental to adjudication of claims to the animals. It states in part:
 It should be noticed that in the Howe Horse Incident the Estray Laws were not followed.
 The testimony also indicates that horses were lost and/or released during the 1950's and up to about 1964 or 1965 and that since then no acts actually showing ownership have taken place by the persons claiming the horses or having signed the bills of sale for these horses.
 Possibly action to substantiate ownership could have been initiated under the Idaho Stallion Law . . . (o)r under the Idaho Estray Law. . . . But, the actions taken in capturing the horses here in question did not follow either of these Idaho laws and thus under the Idaho cases cited to you and general case law no title can be based upon these laws and none of the claimants could claim title under the laws since they have not followed them.
 J.App. 264-266.
 
 
 [36]
 J.App. 78-91
 
 
 [37]
 J.App. 181-182, 186
 
 
 [38]
 J.App. 91
 
 
 [39]
 J.App. 181-182
 
 
 [40]
 J.App. 181-182
 
 
 [41]
 The Brand Inspector's discussion of these horses, J.App. 82-84, does not indicate exactly how many horses were pictured
 
 
 [42]
 J.App. 83-84. The decision also undertook to establish the ownership of a small number of horses, some branded, which were found not to have been involved in the roundup, but were added to the group shipped to Nebraska for slaughter. The bases for these determinations were either the brands or their identification by an individual who was said to have "a well-developed ability to recognize and remember individual horses." J.App. 86
 
 
 [43]
 J.App. 90
 
 
 [44]
 J.App. 91. By this time all of the bills of sale had been assigned to one person. Even assuming that this evidence sufficed to show private ownership of the horses at one time, it does not resolve the issue relevant under § 5 of the Act. The horses could be claimed only by individuals who could prove ownership under state law, and any horse as to which ownership could not be demonstrated would be wild and free-roaming within the contemplation of the Act even though at some past time it might have been domesticated. This result is implicit in the Idaho Attorney General's memorandum which cautioned the Brand Inspector that the horses probably could not be claimed under the state's estray laws, J.App. 263-267. If they could not be so claimed they necessarily fell within the Act's definition of wild free-roaming horses. See text supra at note 13
 
 
 [45]
 J.App. 137
 
 
 [46]
 J.App. 142
 
 
 [47]
 Appellee filed a cross-appeal from the District Court's stay of its judgment pending this appeal. Since, in their brief they offer no argument whatsoever in support of the cross-appeal, we decline to consider any question in regard to the stay. Fed.R.App.P. 28(h); Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. 7, 11 n.16, 485 F.2d 786, 790 n.16, cert. denied, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1973), and cases cited therein
 
 
 [48]
 Act, § 5, 16 U.S.C. § 1335 (Supp. V 1975)
 
 
 [49]
 Act, §§ 3(a), 6, 16 U.S.C. §§ 1333(a), 1336 (Supp. V 1975)
 
 
 [50]
 See, e.g., First Nat'l Bank v. Walker Bank & Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343, 349 (1966); United Shoe Workers AFL-CIO v. Bedell, 165 U.S.App.D.C. 113, 118, 506 F.2d 174, 179 (1974); Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 316, 486 F.2d 375, 383, cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1973); National Petroleum Ref. Ass'n v. FTC, 157 U.S.App.D.C. 83, 100, 482 F.2d 672, 689, cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1973)
 
 
 [51]
 Act, § 1, 16 U.S.C. § 1331 (Supp. V 1975)
 
 
 [52]
 Id
 
 
 [53]
 Id
 
 
 [54]
 The hearings were conducted by the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs and by the Subcommittee on Public Lands of the House Committee on Interior and Insular Affairs
 
 
 [55]
 Hearings before the Subcomm. on Public Lands, House Comm. on Interior and Insular Affairs, 92d Cong., 1st Sess., 27, 81-82, 84-85, 97, 135-136, 183-184 (1971) (hereinafter 1971 House Hearings ); Hearings before the Subcomm. on Public Lands, Senate Comm. on Interior and Insular Affairs, 92d Cong., 1st Sess., 52, 58, 73, 88-95, 181 (1971) (hereinafter cited 1971 Senate Hearings )
 
 
 [56]
 1971 House Hearings at 27
 
 
 [57]
 1971 Senate Hearings at 52
 
 
 [58]
 S. 1116 as amended and modified eventuated as the Act
 
 
 [59]
 S.Rep.No.242, 92d Cong., 1st Sess. 3 (1971), U.S.Code Cong. & Admin.News 1971, pp. 2149, 2150
 
 
 [60]
 H.R.Rep.No.480, 92d Cong., 1st Sess. 5 (1971). Appellees point further to other testimony at the hearings in an effort to demonstrate that Congress intended that state officials make the final determinations on ownership of animals claimed pursuant to § 5. They rely specifically on the testimony of several individuals distressed by language in several bills under consideration which would have required that ownership claims be proven to the satisfaction of the Secretaries. 1971 House Hearings at 149; 1971 Senate Hearings at 136. The major objection to a provision of that kind was that it would lead to conflict with various state brand and estray laws and would promote sentiments for a national law on brands and estrays. 1971 House Hearings at 121-122, 149; 1971 Senate Hearings at 134-135, 156. Dean T. Prosser, chief brand inspector and executive secretary of the Wyoming Stock Growers Association and president of the International Livestock Brand Conference, an organization representing official brand inspection agencies and livestock law enforcement officers from 21 states and several Canadian and Mexican provinces testified as follows:
 My point here that I wish to stress is that with these State laws in effect, the proposal to classify all unbranded horses and burros running on public lands as free-roaming horses and burros, except those to which private owners can establish title to the satisfaction of the Secretary of the Interior is in direct conflict.
 As an organization representing all States with existing brand laws, we are apprehensive about the possibility of a national law that could create such "conflicts" or even override existing established State laws. We do not oppose the establishment of wild horse refuges where the need can be clearly demonstrated, and where all parties concerned can come to agreement, but we do oppose an arbitrary establishment of such refuges by national law, which we fear may be only done as a legislation reaction to the hysteria that has unquestionably been created by the media in regard to this matter. If we confined wild horse refuges to those areas where the true feral Spanish mustang exists, we would perhaps be on sound ground. Moreover, the language used in many of these bills such as I have previously read concerns us deeply, and I only hope that the subcommittee will take our suggestions into consideration so as to help avoid unneeded and unfortunate conflicts with existing laws regarding the classification of unbranded horses per se.
 1971 House Hearings at 149.
 
 
 [61]
 National Petroleum Ref. Ass'n v. FTC, supra note 50, 157 U.S.App.D.C. at 100, 482 F.2d at 689
 
 
 [62]
 See text supra at notes 56-57
 
 
 [63]
 See text supra at note 55
 
 
 [64]
 See note 8 supra
 
 
 [65]
 See text supra at note 56
 
 
 [66]
 Dilution of the traditional standards and burdens of proof conceivably could wreak havoc on the legislative scheme. See text supra at notes 34-44. The dangers of departure from accepted norms is not unreal. For example, witnesses testified at the subcommittee hearings that legislation was needed to combat a technique common in many states. Ranchers frequently release their own horses into herds of wild horses and then seize the wild horses when they reclaim their horses. 1971 House Hearings at 15, 89-90, 185. While state brand and estray laws might forbid such practices, the testimony indicated that they are widespread
 
 
 [67]
 See text supra at notes 59-60
 
 
 [68]
 See text supra at notes 56-57
 
 
 [69]
 J.App. 175-178
 
 
 [70]
 J.App. 176
 
 
 [71]
 J.App. 176
 
 
 [72]
 J.App. 177. Proof that the state agency charged with livestock inspection had accepted the claim as valid was also required
 
 
 [73]
 J.App. 164-166
 
 
 [74]
 J.App. 165
 
 
 [75]
 J.App. 166
 
 
 [76]
 J.App. 166
 
 
 [77]
 J.App. 166
 
 
 [78]
 43 C.F.R. §§ 4700 et seq. (1976)
 
 
 [79]
 43 C.F.R. § 4720.2(a) (1976)
 
 
 [80]
 43 C.F.R. § 4720.2(b) (1976)
 
 
 [81]
 Id
 
 
 [82]
 Id
 
 
 [83]
 Id
 
 
 [84]
 J.App. 261-262
 
 
 [85]
 J.App. 261
 
 
 [86]
 J.App. 261
 
 
 [87]
 J.App. 261
 
 
 [88]
 J.App. 261
 
 
 [89]
 See text supra at notes 73-77
 
 
 [90]
 See text supra at notes 78-83
 
 
 [91]
 See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 433-434, 91 S.Ct. 849, 854-855, 28 L.Ed.2d 158, 165 (1971); United States v. City of Chicago, 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9, 12-13 (1970); Udall v. Tallman, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 619 (1965)
 
 
 [92]
 Power Reactor Co. v. Electrical Workers Int'l Union, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961), quoting Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933), in turn quoted in Udall v. Tallman, supra note 91, 380 U.S. at 16, 85 S.Ct. at 801, 13 L.Ed.2d at 625
 
 
 [93]
 Act, §§ 6, 8(a), (b), 16 U.S.C. §§ 1336, 1338(a), (b) (Supp. V 1975)
 
 
 [94]
 See General Elec. Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976)
 
 
 [95]
 Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136, 145 (1946), quoted in Udall v. Tallman, supra note 91, 380 U.S. at 16, 85 S.Ct. at 801, 13 L.Ed.2d at 625