**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO et al., Plaintiffs,**

v.

**R. G. FREEMAN, III, Defendant.**

**Civ. A. No. 79–2955.**

United States District Court, District of Columbia.

Sept. 25, 1980.

Mitchell J. Notis, James R. Rosa, Washington, D. C., for plaintiffs.

David H. Shapiro, Asst. U. S. Atty., Washington, D. C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* and 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, in which plaintiffs, three individual federal employees and six labor unions representing such employees, request that the Court declare unlawful regulations promulgated by the General Services Administration (GSA) requiring federal employees to pay for the use of parking spaces in facilities controlled by GSA or other federal agencies. Plaintiffs also request the Court to set aside these regulations, enjoin the Administrator of GSA from charging federal employees for parking in federal buildings, and order him to make restitution to the employees for monies paid for such parking.

The challenge to the GSA regulations rests on two grounds: first, that plaintiffs' property interest in free parking was taken from them without due process of law in violation of the Fifth Amendment; and second, that defendant did not issue the regulation in question pursuant to legitimate statutory or other authority and that the resultant agency actions were therefore arbitrary and capricious.[1]

---

1. Plaintiffs also claim that the GSA action is arbitrary because GSA did not perform its own studies to establish a nexus between paid parking and energy conservation, relying instead upon the judgment of the Office of Management and Budget. However, this claim is em-

■ This matter is presently before the Court on the government's motion to dismiss on grounds that plaintiffs' complaint fails to state a claim upon which relief may be granted and that the Court lacks subject matter jurisdiction. Since the government has not shown "beyond doubt that the [plaintiffs] can prove no set of facts in support of his claim which would entitle [them] to relief,"[2] the motion to dismiss will be denied.

## I

On April 5, 1979, President Carter addressed the Nation on the severe nature of the nation's energy problems. He announced and proposed a number of programs directed towards energy conservation and reduction of the dependence of the United States upon imports of foreign oil. As part of the proposed effort, he stated that

> Steps will be taken to eliminate free parking for Government employees in order to reduce the waste of energy, particularly gasoline, in commuting to and from work.[3]

Referring to this presidential address, the Office of Management and Budget (OMB) issued Circular No. A–118 establishing a policy of phasing in fees for the use of parking heretofor provided for free to federal employees. This Circular was distributed in draft form to federal agencies and employee unions for comment on April 6, 1979, and it was published in final version on August 17, 1979. 44 Fed.Reg. 48638. Paragraph 9(b) of the Circular cites as authority for the establishment of charges for parking the Federal Property and Administrative Service Act as amended (40 U.S.C. § 490),[4] and paragraph 10(a) vests responsibility in GSA for issuing "regulations implementing the provisions of this Circular ...." 44 Fed.Reg. 48640.

On September 6, 1979, GSA issued Temporary Regulation D–65, prescribing revised policies and procedures for the assignment of federal employee parking spaces and the assessment of charges for the use of such spaces. 44 Fed.Reg. 53161. The only authority cited for the issuance of this regulation is the aforementioned OMB Circular. The regulation has since been implemented, and this action followed.

## II

Plaintiffs' first argument is that they possess a property interest in free parking,[5] that under the due process clause of the Constitution this interest may not be abridged without a hearing of some kind, and that they were not afforded such hearing. The government argues in response that the requirement of a fee for parking does not deprive federal workers of property rights protected by the Fifth Amendment, and the Court agrees.

Under *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972),

---

braced by the larger issue of whether an OMB circular establishing a policy of paid parking for federal employees for reasons of energy conservation is sufficient authority to support the issuance of regulations by GSA requiring that parking fees be paid, and the Court will deal with the claim in this broader context.

**2.** *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). As noted *infra*, the Court clearly has jurisdiction under 28 U.S.C. § 1331(a).

**3.** Weekly Compilation of Presidential Documents, April 5, 1979, p. 614.

**4.** 40 U.S.C. § 490(j) authorizes and directs the Administrator of GSA to charge anyone furnished with space at rates to be determined in GSA regulations; § 490(k) authorizes executive agencies other than GSA to charge occupants of space provided by them at rates approved by GSA.

**5.** More specifically, plaintiffs contend that free or low–cost parking constitutes a "condition of employment" as defined in the Civil Service Reform Act, 5 U.S.C. § 7103(a)(14), with respect to which defendant therefore has a duty to bargain, and that under the labor laws an employer may not unilaterally alter the conditions of employment where the employees have selected a union to represent them. From these premises, plaintiffs conclude that free or low–cost parking represents the kind of property interest that may not be taken from them without due process of law.

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

■ Plaintiffs cannot be deemed to possess a property interest in free parking absent some underlying grant giving rise to a claim under law. There is no statute providing the underpinning to such a grant nor can plaintiffs point to an existing collective bargaining agreement obligating the government to provide this benefit to them.[6]

Plaintiffs' sole theory in this regard rests on the claim that the government bargained in the past with some groups of federal employees regarding parking, and that by virtue of that fact parking has become a "condition of employment" which the government may not unilaterally change at any time. In that regard, plaintiffs rely on a statement in OMB Circular No. A–118 which specifically exempts from parking charges employees covered by such an agreement for the duration of the agreement, in an effort to convert that statement into an admission that free parking is and has been a negotiable condition of employment statutorily protected from unilateral change under 5 U.S.C. § 7103(a)(14), and for that reason is a property interest constitutionally protected by the Fifth Amendment.

■ But the Circular cannot be interpreted so broadly. Actually, it appears to be nothing more than an effort to preserve existing agreements on parking to the apparently isolated extent that parking has been a subject of collective bargaining. But merely because free parking has been bargained about in the past with respect to some federal employees it has not become a condition of employment for all, nor was it converted into a benefit that may not be unilaterally changed by the employer at any time in the future with respect to these plaintiffs. See *Allied Chemical Workers v. Pittsburgh Glass Co.*, 404 U.S. 157, 187, 92 S.Ct. 383, 401, 30 L.Ed.2d 341 (1971).

The only case cited by plaintiffs in support of their due process theory is *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). In that case, the Court held that an employer may not unilaterally change conditions of employment which are under negotiation or about which the union sought to negotiate. But plaintiffs do not allege that free parking issues were either under negotiation or that plaintiffs were seeking to negotiate about them at the time that the government promulgated the regulation in question. The mere expectation that defendant would continue to offer free parking to plaintiffs, in absence of any indication that this was a matter of negotiation between these particular parties or was contemplated to be so in the future, does not rise to the magnitude of the expectations or rights recognized by the Supreme Court as property interests in *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). See *Police Association v. Department of the Treasury*, Civil Action No. 78–0236 (D.D.C. May 16, 1980), p. 2. It follows that the imposition of parking fees without a hearing did not violate plaintiffs' due process rights.

### III

The government has also moved to dismiss on the ground that the complaint fails to state a claim upon which relief may be granted, and that the Court lacks jurisdiction because there clearly was statutory authority for its actions. Upon the present record, at least, those arguments cannot be sustained, for two separate reasons.

It is clear that the paid parking plan was intended to be a measure to conserve energy. The President, in his statement of

---

**6.** Plaintiffs assert that the government has a duty to bargain with plaintiffs before withdrawing the benefit of free or low–cost parking from them. However, a duty to bargain over certain benefits does not impose an obligation to grant those same benefits. See *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *NLRB v. Wooster Division of Borg–Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

April 5, 1979, so stated and the reasons for instituting parking charges cited in OMB Circular A–118, upon which the GSA regulation in question rested, likewise focus on reduction of energy consumption.[7] It is equally clear, however, that neither the President, nor OMB, nor the GSA complied with requirements of the Energy Policy and Conservation Act, 42 U.S.C. § 6201 *et seq.*, which permits any "energy conservation contingency plan" proposed by the President to become effective only after transmittal to Congress and approval by a resolution by each House. 42 U.S.C. § 6261.

Section 6262(a)(1) defines "energy conservation contingency plan" as "a plan which imposes reasonable restrictions on the public or private use of energy which are necessary to reduce energy consumption." A plan to phase in over time the assessment of charges for previously free parking space for federal employees in order to reduce the consumption of energy would appear to fall squarely within this definition. Indeed, other energy measures affecting government property and employees–such as the restrictions placed on thermostat settings in government buildings–have been transmitted to Congress and approved under section 6261 before taking effect.[8] The paid parking plan was never transmitted to Congress, and its implementation without congressional approval therefore is, on is face, a violation of the Act.

The government argues that compliance with the Act was unnecessary because GSA was and is relying on other statutory authority, that is, the Federal Property and Administrative Service Act, as amended, 40 U.S.C. § 490. Section 490(j) of that law provides that

[t]he Administrator is authorized and directed to charge any one furnished services, space, quarters, maintenance, repair, or other facilities . . . at rates to be determined by the Administrator from time to time and provided for in regulations issued by him.[9]

By its terms, the statute would appear to mandate the charging of parking fees at all facilities operated by GSA, leaving only the rates to be charged to the discretion of the Administrator.[10] However, GSA, which is vested with the authority to administer the statute, has always interpreted that authority as being discretionary. Until it received the OMB directive, that is, for a period of seven years since the enactment of the statute, it has apparently never imposed parking fees upon users of GSA parking spaces, and it can hardly now be heard to argue in support of its present action that it violated the law during that entire period.

The contemporaneous interpretation of a statute by the agency entrusted with its enforcement is of course entitled to great weight. *Miller v. Youakim*, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979); *Norwegian Nitrogen Co. v. United States*,

7. The Circular states that the

energy constraints on our nation are already requiring changes in driving patterns . . . . Free or low–cost parking biases an employee's decision whether to drive alone, carpool or use public transit for commuting. Therefore, a basis for charging for the use of parking facilities needs to be established which is . . . consistent with related policies regarding air quality, energy conservation and reduced traffic congestion.

48 Fed.Reg. 48638.

8. The Emergency Building Temperature Restrictions were embodied in Energy Conservation Contingency Plan No. 2, reprinted in 125 Cong.Rec.S. 5135. With exceptions not here relevant, it applies to all buildings, including buildings operated by the United States or any agency thereof. See sections 2(f)–(h), 3(a).

The plan containing the thermostat restrictions was transmitted to Congress on March 1, 1979, and approved by Senate Resolution 122 on May 2, 1979, and by House Resolution 209 on May 10, 1979.

9. Section 490(k) authorizes any executive agency other than GSA to charge occupants of space it provides at rates approved by GSA. See P.L. 92–313. The Comptroller General has determined that section 490 applies to provision of parking space. See 55 Comp.Gen. 897 (1976).

10. The regulations promulgated under section 490 provide that "GSA will charge anyone for space services furnished by GSA (unless exempted by the Administrator of General Services)." 41 C.F.R. § 101–21.002(a).

288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *American Horse Protection Association v. Department of Interior*, 551 F.2d 432 (D.C.Cir.1977).[11] Because of the consistent GSA practice, and in the absence of other persuasive indicia of legislative purpose, the Court concludes that the statute, properly construed, does not require the imposition of parking fees but authorizes GSA to use its discretion in requiring or not requiring users to pay for their parking. See *Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977).

The next question to be considered relates to the basis upon which this discretion be exercised. This involves an examination of the purpose or purposes underlying section 490, for the actions of an agency must, of course, relate, at least in a general way, to the purposes of the legislature in authorizing such actions.[12]

It is clear beyond any doubt that section 490 had no purposes other than the achievement of more effective financing of congressionally–authorized public building programs and the promotion of more economical use of space by government agencies. See, for example, the House committee report which states that this provision

> would require Government departments and agencies to pay user charges for the space they occupy in GSA–operated buildings. Such user charges would be deposited into the buildings fund ... GSA would be able to use the assets of the fund to finance real property management and related activities, which include all the various public building programs authorized by Congress.

H.R.Rep.No.92–989, U.S.Code & Cong. Admin.News, pp. 2370, 2372 (1972). There is not a single word in the legislative history of the Act suggesting that Congress meant parking fees to be imposed as incentives for the reduction of energy consumption. The use of section 490 as a means toward that end represents a radical departure from the purposes of the Congress in enacting the law upon which the government places its reliance.[13]

To be sure, agencies have on occasion been permitted to exercise their otherwise legitimate powers to achieve ends not directly and explicitly contemplated by legislative draftsmen. See, *e. g.*, Executive Orders 10479 of August 13, 1953 and 10557 of September 3, 1954, which required the inclusion of nondiscrimination clauses in government contracts, and which were upheld as valid although Title 40 (which regulated the utilization, management and disposal of property by government agencies) and Title 41 (which dealt with government contracts and procurement) provided no affirmative indication of legislative intent to promote the programs represented by these clauses. See, *e. g.*, *Farmer v. Philadelphia Electric Company*, 329 F.2d 3 (3d Cir. 1964).

But we are confronted here with more than a congressional omission to specify a particular purpose for the exercise of executive power. The Congress has unambiguously directed, by way of the Energy Policy and Conservation Act, that energy conservation plans may not become effective without congressional review and ap-

---

**11.** See also *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950) and *Federal Trade Commission v. Bunte*, 312 U.S. 349, 352, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941), which held that

> just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.

**12.** See *Environmental Defense Fund v. Ruckelshaus*, 439 F.2d 584, 596 (D.C.Cir.1971), holding that "the court has an obligation to ensure

that the administrative standards conform to the legislative purpose, ...."

**13.** See *District of Columbia National Bank v. District of Columbia*, 348 F.2d 808 (D.C.Cir. 1965), where Judge Leventhal, writing for the Court, stated that a court "may depart from the literal meaning of the words [of a statute] when at variance with the intention of the legislature as revealed by legislative history." 348 F.2d at 810. See also *Steelworkers v. Weber*, 443 U.S. 193, 201–07, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979); *United States v. American Trucking Association*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940).

proval. In that posture a mere general species of legislative authority is unavailing to the government; for the Executive may obviously not rely on the broad wording of one law to achieve ends expressly foreclosed to it, or permitted to it only under specified conditions, by another, more specific statutory directive. See *Castaneda–Gonzalez v. Immigration and Naturalization Service*, 564 F.2d 417, 423 (D.C.Cir.1977) (reiterating the "frequently applied maxim of statutory construction that a specific provision prevails over a more general one") The law mandates that presidential energy conservation plans may become effective only upon scrutiny and approval by the Congress, and the Court would not be justified in allowing the Executive to avoid the accountability to the legislative branch this statutory provision envisions.

On that basis alone, it appears that plaintiffs have sufficiently alleged a claim of lack of lawful authority sufficient to survive a motion to dismiss.

### IV

Reference has been made herein to "the government" and to "the Executive Branch" as a single entity. However, in reality this case deals with three distinct entities within that Branch, with different powers and responsibilities over the administration of the federal government and its programs–and these do not necessarily overlap, nor can they be simply cumulated.

■ The President, of course, is the head of the Executive Branch, and in that capacity he has great powers with respect to its management. See, e. g., 5 U.S.C. § 901(d) (Presidential power with respect to executive reorganization). On that basis, an Executive Order, if issued pursuant to legitimate Presidential authority, would be accorded the force and effect given to a statute enacted by Congress. *Association for Women in Science v. Califano*, 566 F.2d 339, 344 (D.C.Cir.1977).[14]

■ The Court need decide here whether the President could have achieved some or all of the objectives of the parking fee measure by Executive Order for no such Order was ever issued. Insofar as the present record shows, the President made a public speech, in which he announced his intention to impose certain energy conservation measures–and that is all he did, in regard to the subject under consideration in this case.[15] This is an insufficient basis for the exercise of lawful authority by executive agencies.

■ The second entity involved, the Office of Management and Budget, was established by Reorganization Plan No. 2 of 1970, 84 Stat. 2085, as the successor to the Bureau of Budget. Its powers and responsibilities are detailed in 31 U.S.C. §§ 1–26. None of these relates directly to energy conservation, and, more significantly, none of them provides that OMB may exercise the discretion granted to GSA by 40 U.S.C. § 490. And nothing in the statute suggests that the Office is vested either with the authority to direct GSA to charge federal employees for parking or with the power to charge for parking itself.

Nor can the problem of OMB's authority be resolved by reliance on Presidential power. Reorganization Plan No. 2 states that OMB "shall perform such functions as the President may from time to time delegate or assign thereto," but, as stated, the President does not seem to have formally delegated authority to OMB with respect to the subject matter of this action.[16]

**14.** It is to be noted, however, that an Executive Order cannot supersede a statute. *Marks v. Central Intelligence Agency*, 590 F.2d 997, 1003 (D.C.Cir.1978).

**15.** Defendant has not informed the Court of any additional Presidential involvement, nor has he advised the Court of any Presidential authority to act with regard to energy conser- vation and federal employees without issuing an Executive Order.

**16.** The Court need not and does not decide whether the President, as head of the Executive Branch, would have the power to direct GSA with respect to a matter entrusted to its discretion by statute.

GSA, the third entity here involved, purported to exercise discretion vested in it, as noted above, by a law having one purpose in order to achieve a wholly different purpose, apparently solely because it was directed to do so by OMB. That, of course, is not an exercise of discretion at all.[17]

For the reasons stated, the government's motion to dismiss will be denied.[18] Plaintiffs have not thus far made a request for judgment. If and when such a request is made, the government will have an opportunity to attempt to demonstrate that, for reasons not apparent at this juncture, such judgment should not be entered.

17. It is doubtful, and the government has cited no authority for the proposition that the powers of the three entities here involved, each insufficient alone as exercised, can be aggregated to achieve the particular purpose sought. It is not necessary to decide this issue at this time, however, since only a motion to dismiss is now pending.

18. The government also contends that plaintiffs have not established a basis for subject matter jurisdiction before this Court. Plaintiffs have alleged as grounds for jurisdiction 28 U.S.C. § 1331(a), § 2201 (the Declaratory Judgment Act), and 5 U.S.C. § 701 (the Administrative Procedure Act). Neither constitutes an independent grant of subject matter jurisdiction. See *Schilling v. Rogers,* 363 U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960) (Declaratory Judgment Act); *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (APA). However, plaintiffs' claim clearly "arises under the Constitution, laws, or treaties of the United States," and jurisdiction therefore properly lies under 28 U.S.C. § 1331(a). Wright and Miller, Federal Practice and Procedure, Vol. 12, § 3562, p. 411 (1975).