LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, LOCAL UNION NO. 1057, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, LOCAL 630, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 75–1854, 75–1859.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1976.

Decided Nov. 23, 1977.

Arthur M. Schiller, Washington, D. C., with whom Robert J. Connerton, Jules Bernstein and Theodore T. Green, Washington, D. C., were on the brief, for petitioner in No. 75–1854, and also argued for petitioner in No. 75–1859.

Carl L. Taylor, Atty., N. L. R. B., Washington, D. C., for respondent. John S. Irving, Gen. Counsel, N. L. R. B., and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief for respondent.

Joseph H. Kaplan, Joseph C. Segor and Howard S. Susskind, Miami, Fla., were on the brief for petitioner in No. 75–1859.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

WILKEY, Circuit Judge, respectfully dissents.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

These cases, on mainly undisputed facts, require interpretation of one short clause lying obscurely among the many pages of this Nation's labor legislation. The issue is simply framed, yet in facing its resolution the parties' arguments—and Congress' lack of clarity—place us on a precipice surrounded by slippery slopes. In our quest for a decision avoiding the dangers envisioned by both sides, we strive for maximum adherence to the congressional language and intent.

I

The 1947 Taft-Hartley amendments[1] to the National Labor Relations Act[2] expressly excepted nonproprietary healthcare employees from coverage.[3] By 1974, however, Congress had become convinced that the nearly 1.5 million such employees should be brought under the Act's umbrella,[4] and the 27-year-old exception was then removed.[5] Concerned, however, by the potential impact of a work stoppage on patient welfare, Congress also included several provisions designed to protect against abrupt terminations of health care. One of these provisions added Section 8(g), which we are called upon today to interpret. That section provides:

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writ-

1. Pub.L.No.80–101, § 2(2), 61 Stat. 137 (1947).

2. 29 U.S.C. §§ 151 et seq. (1970). The original National Labor Relations (Wagner) Act of 1935, ch. 372, § 2, 49 Stat. 450 (1935), contained no express exclusion, and the Board's assumption of jurisdiction over nonprofit hospitals was affirmed by this court in 1944. NLRB v. Central Dispensary & Emergency Hosp., 79 U.S.App.D.C. 274, 145 F.2d 852 (1944), cert. denied, 324 U.S. 847, 65 S.Ct. 684, 89 L.Ed. 1408 (1945) (enforcing Central Dispensary & Emergency Hosp., 44 N.L.R.B. 533, 539–542 (1942)). Although no explicit exception was made for employees of proprietary hospitals, not until 1967 did the Board find them generally to be within the coverage of the Act. Butte Medical Properties, 168 N.L.R.B. 266, 267–268 (1967) (overruling Flatbush Gen. Hosp., 126 N.L.R.B. 144 (1960)).

3. Labor Management Relations (Taft-Hartley) Act, § 2(2), 29 U.S.C. § 152(2) (1970), as amended by Act of July 26, 1974, Pub.L.No.93–360, 88 Stat. 395 (1974).

4. S.Rep.No.766, 93d Cong., 2d Sess. 3 (1974); H.R.Rep.No.1051, 93d Cong., 2d Sess. 4 (1974).

5. Act of July 26, 1974, Pub.L.No.93–360, 88 Stat. 395 (1974).

ing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of section 8(d) of this Act. The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.[6]

We review here two cases involving quite similar disputes. Without providing Section 8(g) notices, local unions, representing non-healthcare employees involved in construction and renovation of hospital facilities, set up reserved-gate picketing at least partially on hospital property.[7] The employers filed charges with the National La-

bor Relations Board,[8] and the Board determined, by identical three-to-two votes, that the locals had violated Section 8(g) even though their picketing was otherwise lawful.[9] The unions have petitioned this court for review of the Board's effectuating orders, and the Board has applied for their enforcement.

The Board felt that while Congress had not legislated expressly with reference to non-healthcare employee picketing at healthcare institutions the language of Section 8(g) literally encompassed the activities challenged.[10] The Board read the section as though it actually stated that

[any] labor organization before engaging in any strike, picketing, or other concerted refusal to work [on the premises of] any health care institution shall, not less than ten days prior to such action, notify the institution and the Federal Mediation

---

6. *Id.*, 29 U.S.C. § 158(g) (Supp. V 1975).

7. In No. 75–1859, the charging party, Lein-Steenberg, was a joint venture engaged in expansion and renovation of a hospital in Stuart, Florida. It had a nonunion subcontractor, Don Taylor Mechanical, Inc., which was picketed at Taylor's reserved gate. The pickets carried signs stating:

   Notice to the Public, Don Taylor Mechanical, Inc., Lowers Our Standards. We have no dispute with any other employer. This is not intended to stop work or deliveries. UA Local Union 630.

   Although some employees of Lein-Steenberg and other subcontractors occasionally honored the picket line, no hospital employees did so, and hospital services were not disrupted. *United Ass'n of Journeymen Local 630 (Lein-Steenberg)*, 219 N.L.R.B. 837, 838 (1975) (hereinafter cited as *Lein-Steenberg*).

   In No. 75–1854, a general contractor, Casey & Glass, was engaged in expansion of a hospital and renovation of its laundry facilities. The union commenced recognitional picketing of Casey & Glass on hospital premises, but once again no hospital employees stopped work in disruption of patient care. Both the hospital and the employer charged that Section 8(g) had been violated. The pickets carried signs with the legend:

   Laborers International Union of North America Local 1057 AFL–CIO "On Strike" Against Casey & Glass, Inc.

   *Laborers' Local 1057 (Mercy Hosp. of Laredo)*, 219 N.L.R.B. 846, 847 (1975) (hereinafter cited as *Mercy Hosp.*) The picketing involved no

entrance to the hospital itself, although the union alleged that the gate selected by Casey & Glass for its employees "was the closest of the four gates to the hospital—located directly adjacent to the hospital's emergency rooms." Laborers Local 1057, Opposition to Motion for Summary Judgment, Joint Appendix (J.App.) 23. The Union further alleged that both the employer and the hospital refused to discuss the impact of the gate selection on hospital operations. *Id.* Eventually, despite the invalidation of the votes of those employees who engaged in the picketing, Local 1057 was certified by the Board as the exclusive bargaining representative of Casey & Glass employees. *Casey & Glass, Inc.*, 219 N.L.R.B. 698 (1975).

   One of Local 1057's arguments is that the Board erred in granting a summary judgment, thus foreclosing the union's opportunity to prove that it had carefully limited its picketing to avoid any impact on the hospital, that the employer's choice of gates was designed to enmesh the hospital in the labor dispute, and that, nonetheless, no adverse effect on the hospital ensued. Because of our disposition of the primary issue of applicability of § 8(g), we have no occasion to examine this contention.

8. In No. 75–1854, the involved hospital also filed a charge. See note 7 *supra*.

9. *Lein-Steenberg, supra* note 7, 219 N.L.R.B. at 840. In *Mercy Hosp., supra* note 7, the Board simply adopted its prior reasoning and conclusions in *Lein-Steenberg*.

10. *Lein-Steenberg, supra* note 7, 219 N.L.R.B. at 839–840.

and Conciliation Service of that intention.
. . .

The Board arrived at its plain-meaning conclusion by reasoning that a strike by any union on hospital premises might interrupt patient care, and that the Section 8(g) notice was but a small imposition on the union.[11] We disagree with the Board that the statutory language is unambiguous, and we find that Congress did not intend that the picketing in question would fall within the purview of Section 8(g).

## II

We are not the first federal appellate tribunal to undertake a construction of Section 8(g). After oral argument in this case, the Court of Appeals for the Seventh Circuit decided *NLRB v. Electrical Workers Local 388.*[12] Relying both on the legislative history of the section [13] and its relationship to the rest of the 1974 amendments,[14] the court held that Section 8(g) requires "notice of proposed labor activity . . . *only when such activity is planned on behalf of employees of the institution.*" [15] In our view, that conclusion is eminently correct.

The Board argues here that by directing the requirements of Section 8(g) to "[a] labor organization" Congress meant *any* labor organization—not just those representing healthcare employees—and that in referring to activities of a labor organization "at a health care institution" the legislative draftsmen utilized "at" in its locational sense.[16] The Board's reading is facially plausible, but it is not the only reasonable interpretation of the language at issue.

The "labor organization[s]" to which Congress spoke could be either single or numerous in variety, depending upon the meaning imparted by the accompanying statutory language. And "at" is commonly used not only as a preposition indicating situs, but also merely to denote some sort of relationship between the object of the preposition and the word or phrase modified. One is as likely to hear that "there is a strike by the ABC Union at the XYZ Company" as that "the ABC Union is striking the XYZ Company," even though both formulations were intended to express exactly the same idea— that XYZ is being struck, and not just that XYZ is the location of a strike. Additionally, as the Seventh Circuit pointed out,

> [w]hen we read the phrase "picketing . . . at a health care institution," we tend to think in broad terms of physical activity taking place on the premises of a health care institution. But, when we read the phrase "strike . . . at a health care institution," or "refusal to work at a health care institution" we tend to think more narrowly of activity involving a group of employees and the health care institution that employs them. We do not, however, believe that the sentence structure of 8(g) will tolerate an interpretation of the word "at" that shifts the location meant from place of employment to place of activity and back again. The preposition serves as a common link between all three forms of labor protest and the health care institution involved, and thus, we believe must have a common meaning applicable in all three contexts.[17]

---

11. The balance to be struck between the magnitude of the infringement of employee interests and the scope of the threat to hospital patients seems, in general, to be a policy decision that Congress has reserved to itself. See notes 56–57 *infra.*

12. 548 F.2d 704 (7th Cir.) *cert. denied,* —— U.S. ——, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977).

13. *Id.* at 708–711.

14. *Id.* at 711–712.

15. *Id.* at 711 (emphasis supplied). As did the Seventh Circuit in its case, we note that the

facts here "do not require us to reach the issue of whether employees engaged in work activities necessary to the present operation of the health care institution, but not employed directly by the institution, should be deemed health care employees." *Id.* at 707 n. 5.

16. *Lein-Steenberg, supra* note 7, 219 N.L.R.B. at 839–840.

17. 548 F.2d at 707–708. In its footnote 6, the court addressed the position of the dissenting Board members that "at" was meant to apply only to "concerted refusal to work at," and not to picketing and striking because "[o]ne can 'picket' a health care institution but not 'refuse

Thus it becomes necessary for us to discern that unclear "common meaning."

Because the phrasing of Section 8(g) is ambiguous, we must determine by other means just what conduct Congress intended its language to encompass. Indeed, even if the language were more precise, "recourse to legislative history to determine the sense in which Congress used the words [still would] not [be] foreclosed,"[18] because "labor legislation does not readily adapt itself to the 'plain meaning' school of jurisprudence."[19] Any search for the legislative design, however, is hampered by the absence of any specific discussion of the statute's impact on non-healthcare employees.[20] We are thus forced, "in the last analysis, to reconstruct how the legislature would have

decided the specific issue if it had been specifically addressed by the legislature."[21]

## III

As previously stated,[22] the primary purpose of the 1974 amendments was to embrace nonprofit hospitals and their employees within the coverage of the Act.[23] Beyond that, "it was recognized that the needs of patients in health care institutions required special consideration in the Act including a provision requiring hospitals to have sufficient notice of any strike or picketing to allow for appropriate arrangements to be made for the continuance of patient care in the event of a work stoppage."[24] A readily understandable occasion

to work a health care institution.'" *Lein-Steenberg, supra* note 7, 219 N.L.R.B. at 842–843 (dissenting opinion). The court rejected this argument on the ground that § 8(g) does not refer just to "striking" and "picketing" but to "engaging in any strike [or] picketing," and that the preposition "at" is necessary for such a construction. 548 F.2d at 707–708 n.6.

We agree that the dissenters' argument is not compelling, but we believe it does point up the dangers of relying solely on plain-meaning analysis. It seems plausible that the draftsmen did originally phrase the provision in a fashion suggested by the Board dissent but later changed it to arrive at a more parallel construction. Because "striking, picketing, or concertedly refusing to work" is perhaps less pleasing than "engaging in any strike, picketing, or concerted refusal to work," the draftsmen may have used the latter phrase without intending to alter the scope of the section from the inclusion of activity directed "at" a health care institution to activity merely occurring on the institution's premises. See text at note 51 *infra.*

18. *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 179, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123, 1127 (1967) ("legislative history may not be disregarded merely because it is arguable that a provision may unambiguously embrace conduct called in question"). Compare *National Woodwork Mfg. Ass'n v. NLRB,* 386 U.S. 612, 619, 87 S.Ct. 1250, 1255, 18 L.Ed.2d 357, 364 (1967), quoting *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226, 228 (1892) ("'familiar rule, that a thing may be within the letter of the statute and yet not . . . within the intention of its makers'" has "particular application in the construction of labor legislation"), with *United States v. Missouri P. R. Co.,* 278 U.S. 269, 278, 49 S.Ct. 133, 135, 73 L.Ed. 322, 377 (1929)

(absent ambiguity or unreasonable result, literal language of statute controls).

19. *International Org. of Masters Local 1740 v. NLRB,* 159 U.S.App.D.C. 11, 14, 486 F.2d 1271, 1274 (1973), *cert. denied,* 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974).

20. *Lein-Steenberg, supra* note 7, 219 N.L.R.B. at 839. In discussing § 8(g) contemporaneously with its enactment, the Board's then General Counsel gave no hint of an understanding that the section applied to non-healthcare employees. See Nash, *Initial Questions from Hospital Legislative Amendments to the NLRA* in Proceedings of New York Univ. Twenty-seventh Annual Conf. on Labor 93, 99–108 (D. Raff ed. 1975). Other commentators were similarly silent. See Feheley, *Amendments to the National Labor Relations Act: Health Care Institutions,* 36 Ohio St.L.J. 235 (1975); Pointer, *The 1974 Health Care Amendments to the National Labor Relations Act,* 26 Lab.L.J. 350 (1975). But see Vernon, *Labor Relations in the Health Care Field Under the 1974 Amendments to the National Labor Relations Act: An Overview and Analysis,* 70 Nw. U.L.Rev. 202, 218 n. 97 (1975).

21. *District 6, UMW v. United States Dep't of Interior,* 183 U.S.App.D.C. 312, 320, 562 F.2d 1260, 1268 (1977) (Leventhal J., concurring).

22. See text *supra* at note 4.

23. S.Rep.No.766, *supra* note 4 at 1, 3; H.R.Rep. No.1051, *supra* note 4, at 1, 4.

24. S.Rep.No.766, *supra* note 4, at 3 and H.R. Rep.No.1051, *supra* note 4, at 4. In 1972, the House overwhelmingly approved a measure that would have removed the statutory exception without providing any safeguards at all. 120 Cong.Rec. 16900 (1974) (remarks of Repre-

for such a provision was the forthcoming eligibility of a group of healthcare employees for the prerogatives afforded by the Act, including the right lawfully to picket and strike. But no new danger in that respect was posed by non-healthcare employees, such as construction workers, employed by non-healthcare contractors on hospital premises. Labor activity by those employees was already subject to the general controls supplied by the Act, and had not previously been thought of as a threat to patient care of a magnitude requiring further restriction.[25] Consequently, although the notice requirement imposed by adoption of Section 8(g) seems logically applicable to the nonpropriety healthcare employees simultaneously brought under the Act, the same cannot be said with reference to non-healthcare employees.[26] As the Seventh Circuit has observed,

> [i]t would be neatly consistent with the overall purpose of extending the protection of the National Labor Relations Act to employees of health care institutions to read this section as an attempt to regulate the newly-protected concerted activity of such employees in order to alleviate any disruption of health care resulting from such activity. It is not nearly so explainable why regulation would be extended to activity engaged in by the employees of other than the institution, activity already protected by the Act prior

to passage of the health care institution amendments.[27]

We are mindful that the notice provision was expressly extended to one group of employees previously encompassed by the Act—proprietary healthcare employees.[28] But Congress addressed itself specifically to that extension and made no mention at all of non-healthcare employees. Each of the congressional committees pointed to the extension and described it as providing "the same procedures for employees of all health care institutions,"[29] thus indicating that other types of employees are unaffected. No one would argue that for Section 8(g) purposes proprietary and nonproprietary healthcare institutions and their employees are not identically situated, but non-healthcare employees are something else again.

The Board does not acknowledge that its interpretation of Section 8(g) is undercut by the limited objectives of the 1974 amendments. On the contrary, it contends that an unadvertised strike by non-healthcare employees of a hospital's subcontractors could cause injury or death to hospital patients.[30] As an example it correctly observes that a sudden strike by employees of a food service subcontractor might cause critical problems.[31] Not to be outdone, the unions point out that strikes involving a good many subcontractors to healthcare institutions—such as suppliers of blood, oxy-

sentative Ashbrook); Pointer, *supra* note 20, at 353. Representative Ashbrook, one of the two primary sponsors of the final 1974 House bill, informs us that the matter of notice arose "[w]hen the hearing revealed a real concern for the public's right to uninterrupted patient care, *apparently fearing strikes by employees of non-profit hospitals* . . . ." 120 Cong.Rec. 16900 (1974) (emphasis supplied).

**25.** *NLRB v. Electrical Workers Local 388, supra* note 12, 548 F.2d at 711.

**26.** See 120 Cong.Rec. 12968 (remarks of Senator Dominick).

**27.** *NLRB v. Electrical Workers Local 388, supra* note 12, 548 F.2d at 708.

**28.** Section 8(g) makes no distinction between proprietary and nonproprietary healthcare facilities of their employees; it expressly refers to "any health care institution." See note 6

*supra*. This was not inadvertent. See text *infra* at note 29.

**29.** S.Rep.No.766, *supra* note 4, at 3 and H.R. Rep.No.1051, *supra* note 4, at 4.

**30.** Brief for Respondent at 21–22.

**31.** *Id.* at 21. We intimate no view on whether such employees, unlike construction workers, are so involved in day-to-day provision of healthcare services that § 8(g) would be applicable. See note 13 *supra*.

As to construction workers, the Board posits that they might engage in unlawful secondary activity on hospital premises that could cause healthcare employees to quit working, and that ten-day notice of such a threat would greatly benefit the hospital. Yet, as the unions observe, a local planning unlawful picketing is unlikely to comply with a requirement that it announce its illegality in advance.

gen or pharmaceuticals—are most likely to take place *off* hospital premises and yet could seriously imperil the welfare of thousands of patients.[32] Hence they argue, and we agree, that Congress could not have intended to intercept every conceivable threat to uninterrupted patient care. We may add that the Board's location-oriented view seemingly would allow off-duty hospital employees to picket without notice just across the street from a hospital, and thus invite the very kind of unannounced cutoff of health care with which Congress was so concerned.

## IV

In our effort to ascertain just where Congress meant to draw the line, we are guided by the many indications of intent in the legislative history. The genesis of Section 8(g) was a portion of S. 2292,[33] introduced by Senator Taft in 1973.[34] That provision required strike and lockout notices by "a health care institution and a labor organization which is the bargaining representative of its employees. . . ."[35] This progenitor of Section 8(g) strongly supports the unions' position, but the Board urges that another part of S. 2292 is to the contrary. That portion would have made it an unfair labor practice for *"any"* labor organization to engage in a strike or picketing except "as expressly permitted" by two earlier subsections.[36] The Board insists from this that at least Senator Taft expressed an interest in the activities of non-healthcare employees, and did know how and how not to limit explicitly his language to healthcare employees. One difficulty with the Board's argument is that the two subsections re-

ferred to admittedly would have applied only to healthcare employees, and even in those sections Senator Taft used the general phrase "labor organization" when indisputably he was referring only to a "labor organization which is the bargaining representative of [a healthcare institution's] employees."[37] Moreover, it would have been anomalous to have created a method whereby healthcare unions could picket and strike lawfully on hospital property, but to have omitted such an outlet for non-healthcare employees who might be employed solely on hospital premises for months or even years while engaged in a construction project. And we agree with the Seventh Circuit's additional remarks on this score:

> We believe this to be the Board's strongest argument, and yet we must reject it. For if Congressional intent in changing from the 1973 proposed version of 8(g) to the enacted 8(g) were as the Board would have us believe, we would expect that somewhere in the Congressional hearings and debates on the hospital amendments we would find some discussion of whether labor activity by non-health care employees related to a health care institution should be proscribed or merely regulated. We have examined the debates and hearings and find no such discussion.[38]

Indeed, the legislative silence is most eloquent. If Congress had thought it was considering such an important restriction on normal collective bargaining prerogatives of non-healthcare employees, we would expect to see vigorous discussion by both congressmen and interested witnesses.[39] In-

---

**32.** See Reply Brief of Petitioner United Association at 12 n.18.

**33.** S. 2292, 93d Cong., 1st Sess. (1973), 120 Cong.Rec. 12941–12943 (1974).

**34.** 120 Cong.Rec. 12945 (1974) (remarks of Senator Taft). The Board relies on a statement by Senator Taft that § 8(g) is aimed at "any picketing or strike," but it is clear in context that he was not referring to picketing by any *type of union*, but instead to *any type of picketing* by healthcare unions. *Id.* ("[a]s examples, this subsection would apply to recognition strikes, area standards strikes, secondary strikes, jurisdictional strikes, and the like").

**35.** S. 2292, 93d Cong., 1st Sess. § 3(b) (1973), 120 Cong.Rec. 12942 (1974).

**36.** *Id.*

**37.** *Id.*

**38.** 548 F.2d at 709.

**39.** See S.Rep.No.766, *supra* note 4 at 2 (witness list). Although the Board argues that the Laborers' Union did make its views known, it is clear that the union did so only as one of "the four major trade unions involved in organizing hospital workers," and not in its capacity as a representative of construction workers. See 120 Cong.Rec. 12939–12940 (1974) (remarks of Senator Javits).

stead, like the Seventh Circuit, "we are struck by the complete absence anywhere in the not insubstantial legislative history of any reference whatsoever to labor activity involving non-health care employees."[40] This reticence on so important a matter counsels against reading a limitation on union rights into Section 8(g)'s imprecise language.[41] If the requisite conditions for minimizing interference with the secondary employer are fulfilled, as they appear to have been in these two cases, reserved-gate picketing on the premises of a secondary employer has long been held lawful under the Act.[42] And we operate here under "a rule of construction which cautions against an expansive reading of [a] section which would adversely affect the right to strike, unless the congressional purpose to give it that meaning persuasively appears either from the structure or history of the statute."[43] This canon is a product not only of a statutory commandment,[44] but also of the commonsense proposition that, because labor legislation is "the result of conflict and compromise between strong contending forces and deeply held views,"[45] a change in the status quo should not be inferred unless Congress has unmistakably indicated its wish to do so.[46]

**40.** *NLRB v. Electrical Workers Local 388, supra* note 12, 548 F.2d at 709.

**41.** See *NLRB v. Allis-Chalmers Mfg. Co., supra* note 18, 388 U.S. at 179, 185–186, 87 S.Ct. at 2006, 2009, 18 L.Ed.2d at 1127, 1130–1131 (literal reading of statutory language is "unrealistic" when "not a single word" in the legislative history referred to the application of the statute proposed).

**42.** *E. g., Sailors Union of the Pac. (Moore Dry Dock Co.),* 92 N.L.R.B. 547, 549 (1950); see National Labor Relations Act § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B) (1970).

**43.** *NLRB v. Drivers Local 639,* 362 U.S. 274, 281–282, 80 S.Ct. 706, 710–711, 4 L.Ed.2d 710, 716–717 (1960); accord, *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 234–235, 83 S.Ct. 1139, 1148–1149, 10 L.Ed.2d 308, 318–319 (1963) (because Congress' "concern for the integrity of the strike weapon has remained constant," courts must give "the right to strike . . . a generous interpretation within the scope of the labor Act").

In this regard the remarks of Senator Humphrey become quite pertinent:

In particular, it seems to me that the 10-day statutory advance notice of any strike or picketing, which I feel would be unacceptable interference with workers' rights in most other industries, is fully justified in the case of hospital employees.

120 Cong.Rec. 13560 (1974).

**44.** National Labor Relations Act § 13, 29 U.S.C. § 163 (1970).

**45.** *Carpenters Local 1976 v. NLRB,* 357 U.S. 93, 99, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186, 1194 (1958).

**46.** The remarks of Senator Williams, the sponsor of the Senate bill and chairman of the Senate Committee, are at once relevant and ironic:

This legislation is the product of compromise, and the National Labor Relations Board in administering the act should understand specifically that this committee understood and the issues confronting it, and went as far as it decided to go and no further and the Labor Board should use extreme caution not to read into this act by implication—or general logical reasoning—something that is not contained in the bill, its report and the explanation thereof.

\* \* \* \* \* \*

My overriding point is that in this carefully tailored legislation Congress decided to treat the health care industry uniquely in certain respects. It decided to go so far, and no more. I trust this bill will be treated by the NLRB and its General Counsel in the same spirit, and not as an excuse to search out and litigate all possible situations, or substitute its will for that of the Congress.

120 Cong.Rec. 22575–22576 (1974). Senator Williams did not get his wish, however. After the Board decided the two cases involved here, he stated:

Plainly, one of the purposes of that cautionary observation was to prevent the Board from interpreting the act in a manner which would diminish rights previously enjoyed under the act or employment relationships which were previously already covered. In relying on my statement as support for its interpretation of § 8(g), the Board indulged in precisely that kind of reasoning which it was the purpose of the statement to forestall.

121 Cong.Rec. S.20466 (daily ed. Nov. 19, 1975); see *id.* (remarks of Senator Taft) ("[the Board's] interpretation is incorrect since it was not my intention in introduc[ing] the hospital bill to change the law with respect to the relationship between employers who were previously covered by the act and the employees and union representatives seeking to represent those employees"); *id.* at H.12311 (daily ed. Dec. 11, 1975) (remarks of Representative

In stark contrast to the complete absence of any expressed desire to extend Section 8(g)'s notice requirement to non-healthcare employees, a good many statements indicate that the reason the legislators did not discuss the requirement vis-a-vis such employees is simply that Congress never intended it to apply to any but healthcare workers. When some members voiced concern that Section 8(g) and other precautions might not sufficiently protect patients from healthcare interruptions, Senator Javits read position letters from "the presidents of the four major unions involved in organizing hospital employees," [47] and Senator Taft argued that "these safeguard procedures will substantially aid health care institutions and their employees settle their disputes responsibly and peacefully . . ." [48] Most congressmen tied their discussion of

Section 8(g) specifically to healthcare employees, [49] and the same linkage permeates the committee reports, wherein healthcare institutions are consistently referred to as "employers" of the employees subject to the notice requirement. [50] It is noteworthy, also, that in the reports Section 8(g) is described as "generally prohibit[ing] a labor organization from striking or picketing a health care institution without first giving 10 days' notice," [51] which is some indication that the use of "at" in the statute itself was inadvertent.

Lastly, we gain a further hint of the congressional intent from scrutiny of Section 8(g)'s relationship to another provision of the Act. "Since a statute like the Taft-Hartley Act is an organism, [the section to be interpreted] must be placed in the con-

Thompson) (agreeing with Senator Taft). But see *id.* at E.6774 (daily ed. Dec. 19, 1975) (remarks of Representative Quie). These postpassage statements are very interesting, but we have placed little emphasis on them in interpreting § 8(g) since "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334, 340 (1960).

47. 120 Cong.Rec. 22577–22578 (1974).

48. *Id.* at 22579.

49. *NLRB v. Electrical Workers Local 388, supra* note 12, 548 F.2d at 710; see, e. g., 120 Cong.Rec. 22580 (1974) (remarks of Senator Dominick) (10-day notice provision balances *healthcare needs and hospital employees'* rights); *id.* at 22574 (remarks of Senator Williams, Senate sponsor of the final bill) (special provisions necessary for "labor relations in the health care industry"); *id.* at 22947 (remarks of Representative Kastenmeier) (10-day notice discussed with reference to "health care industry"); *id.* (remarks of Representative Dellenbach) (10-day notice discussed with reference to "hospital employees"); *id.* at 22943 (Representative Ashbrook, House sponsor with Representative Thompson of the final bill) (same); *id.* at 16899 (Representative Thompson, House sponsor with Representative Ashbrook of the final bill) (referring to "the unions involved in the hospital industry"). We have held that the meaning of a statutory phrase can be found "at least in part" in another phrase freely interchanged by the legislators in discussing the statutory provision. *International Harvestor Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 435, 478 F.2d 615, 639 (1973).

50. S.Rep.No.766, *supra* note 4, at 4 and H.R. Rep.No.1051, *supra* note 4, at 5 (referring to "[r]epeatedly serving such ten day notices upon the employer," although § 8(g) requires notice only to the healthcare institution and the Federal Mediation and Conciliation Service); S.Rep.No.766, *supra* note 4, at 4 and H.R.Rep. No.1051, *supra* note 4, at 6 ("the employer would not be free to bring in large numbers of supervisory help, nurses, staff and other personnel from other facilities for replacement purposes"). See also 120 Cong.Rec. 22949 (1974) (joint statement of House sponsors Ashbrook and Thompson) ("if the parties agreed to end the strike and resume the negotiations there will be no need for a further notice of any sort, because the cessation was subject to agreement"). *For example, the reports state that the notice requirement is waived when the employer has committed certain unfair labor practices but it "would make no sense to read"* this as meaning that if a construction employer is guilty of an unfair labor practice the hospital would be denied its right to notice. *NLRB v. Electrical Workers Local 388, supra* note 12, 548 F.2d at 710; see S.Rep.No.766, *supra* note 4, at 4; H.R.Rep.No.1051, *supra* note 4, at 6.

51. S.Rep.No.766, *supra* note 4, at 4 and H.R. Rep.No.1051, *supra* note 4, at 5. See also S.Rep.No.766, *supra* note 4, at 1 and H.R.Rep. No.1051, *supra* note 4, at 1 (the bill "establishes certain new procedures governing labor relations in health care institutions"); S.Rep.No. 766, *supra* note 4, at 4 and H.R.Rep.No.1051, *supra* note 4, at 6 ("the public interest demands that employees of health care institutions be accorded the same type of treatment under the law as other employees in our society, and that

text of the legislation as a whole." [52] Section 8(d), which is specifically referred to in Section 8(g), was amended at the same time to authorize the Federal Mediation and Conciliation Service to assist in resolving disputes involving "employees of a health care institution." [53] Even if Congress had some feeling that picketing or work-stoppages by non-healthcare employees might interrupt patient care, Section 8(d) itself shows that it was predominantly concerned with such activities when conducted by healthcare employees. No plausible reason has been suggested why Section 8(g) would require non-healthcare employees to notify the Service of their contemplated actions when the Service has no power to do anything about those activities. [54]

## V

To be sure, "Congress was deeply concerned with 'the need to avoid the disruption of patient care *wherever possible*' and . . . this concern was not limited to those areas in which specific statutory exceptions were enacted." [55] But that disquiet had to be weighed against congressional solicitude for recognized collective bargaining rights of employees. We think Congress inserted the notice provision of Section 8(g) to limit the rights then being granted to employees of healthcare institutions, and not to restrict the rights already possessed by other employees. Congress arrived at what it considered to be a fair balance, and the Board is not free to draw the line elsewhere even in a well-intentioned belief that broader protection of the public interest in health care outweighs the resulting imposition on employees. While we respect an administrative agency's interpretation of a statute that it is entrusted with enforcing, [56] in the end the paramount deference must be extended to Congress itself. [57] Where, as here, an agency has misconstrued a congressional directive, our bounden duty is to enforce the congressional will.

The petitions for review are granted, and the cross-applications for enforcement are denied. The orders of the Board herein are reversed, and the cases are remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*

WILKEY, Circuit Judge:

I respectfully dissent.

---

the notice not be utilized to deprive employees of their statutory rights").

**52.** *Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.,* 348 U.S. 437, 443, 75 S.Ct. 489, 491, 99 L.Ed. 510, 515–516 (1955) (plurality opinion by Frankfurter, J.).

**53.** The language added to § 8(d) specifies that: Whenever the collective bargaining involves employees of a health care institution, the provisions of this section 8(d) shall be modified as follows:

(A) The notice of section 8(d)(1) shall be ninety days; the notice of section 8(d)(3) shall be sixty days; and the contract period of section 8(d)(4) shall be ninety days.

(B) Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in section 8(d)(3).

(C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement.

The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.
Act of July 26, 1974, Pub.L.No.93–360, 88 Stat. 395 (1974), 29 U.S.C. § 158(d) (Supp. V 1975).

**54.** *NLRB v. Electrical Workers Local 388, supra* note 12, 548 F.2d at 711. The legislative history indicates that the congressional members anticipated that the amendments would provide a combination of notice and mandatory mediation. *E. g.,* 120 Cong.Rec. 22943 (1974) (Representative Ashbrook); *id.* at 12970 (Senator Taft).

**55.** *St. John's Hosp. & School of Nursing, Inc. v. NLRB,* 557 F.2d 1368, 1374 (10th Cir. 1977) (emphasis in original).

**56.** *NLRB v. Weingarten,* 420 U.S. 251, 266–267, 95 S.Ct. 959, 968, 43 L.Ed.2d 171, 183 (1975); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965).

**57.** *NLRB v. Brown,* 380 U.S. 278, 291–292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839, 849 (1965); *Lubrizol Corp. v. EPA,* 183 U.S.App.D.C. 288, 300, 562 F.2d 807, 819 (1977).