UNITED MINE WORKERS OF
AMERICA, Petitioner,

v.

Cecil D. ANDRUS, Secretary of the
Interior, Respondent,

Carbon Fuel Co., Intervenor.

No. 76-1208.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 17, 1977.

Decided May 9, 1978.

Rehearing Denied May 31, 1978.

Certiorari Denied Oct. 30, 1978.
See 99 S.Ct. 313.

Petition for Review of an Order of the Board of Mine Operation Appeals of the Department of Interior.

Steven B. Jacobson, Washington, D. C., with whom Harrison Combs, Washington, D. C., was on the brief, for petitioner.

Edwin E. Huddleson, III, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen. and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Charles Q. Gage, Charleston, W. Va., for intervenor.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

■ Once again[1] we are confronted by a controversy generated by ambiguity in the Federal Coal Mine Health and Safety Act of 1969.[2] The issue on this occasion is whether a mine operator served with notice of violation of a health standard not posing imminent danger could obtain administra-

tive review of the charge on the merits prior to issuance of an order commanding withdrawal of his miners from the affected area. We answer that question in the negative. Our decision is governed by the terms of the 1969 Act notwithstanding its displacement by new legislation in 1977,[3] and resultantly our opinion speaks largely to the past.

1. See, e. g., Association of Bituminous Contractors, Inc. v. Andrus, 189 U.S.App.D.C. ——, 581 F.2d 853 (1978); UMW v. Kleppe, 174 U.S.App.D.C. 328, 532 F.2d 1403, cert. denied, 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976); Phillips v. Interior Bd. of Mine Operations Appeals, 163 U.S.App.D.C. 104, 500 F.2d 772, (1974), cert. denied, 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); National Independent Coal Operators Ass'n v. Morton, 161 U.S.App.D.C. 68, 494 F.2d 987 (1974), aff'd, 423 U.S. 388, 96 S.Ct. 809, 46 L.Ed.2d 580 (1976).

2. Pub.L. No. 91–173, 83 Stat. 742, 30 U.S.C. §§ 801 et seq. (1970).

3. Late last year Congress passed the Federal Mine Safety and Health Amendments Act of 1977, Pub.L. No. 95–164, 91 Stat. 1290, which supersedes both the Federal Coal Mine Health and Safety Act of 1969 and the Federal Metal and Nonmetallic Mine Safety Act of 1966, Pub.L. No. 89–577, 80 Stat. 772. By then this case had already been submitted to us for decision, and only less than a month ago did the new legislation become effective. Federal Mine Safety and Health Amendments Act of 1977, Pub.L. No. 95–164, tit. III, § 307, 91 Stat. 1322. None of the parties contend, nor does anything uncovered by our independent research suggest, that Congress intended any application whatsoever of the 1977 Act to administrative proceedings long since concluded under its 1969 predecessor, as is the situation here. See id. § 301(c). Compare Swinton v. J. Frank Kelly, Inc., 180 U.S.App.D.C. 216, 218–219, 554 F.2d 1075, 1077–1078, cert. denied, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976) with de Rodulfa v. United States, 149 U.S.App. D.C. 154, 161, 164–167, 461 F.2d 1240, 1247, 1250–1253, cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972). See also United States v. St. Louis, S. F. & T. Ry., 270 U.S. 1, 3, 46 S.Ct. 182, 183, 70 L.Ed. 435, 437 (1926); United States Fidelity & Guar. Co. v. United States ex rel. Struthers Wells Co., 209 U.S. 306, 315–317, 28 S.Ct. 537, 540, 52 L.Ed. 804, 807–808 (1908). And although we have no call to construe the 1977 Act itself, our investigation uncovered nothing in its language or legislative history that modifies our view of how Congress

contemplated that the 1969 Act would operate on the matter here in issue. On the contrary, enforcement proceedings under the new Act generally are "patterned on the current Coal Act," S.Rep. No. 181, 95th Cong., 1st Sess. 12 (1977), [1977] U.S.Code Cong. & Admin.News pp. 3401, 3412, notwithstanding that the 1977 counterparts of the relevant provisions of the 1969 Act are cast in substantially modified language. See Federal Mine Safety and Health Amendments Act of 1977, Pub.L. No. 95–164, tit. II, § 201, 91 Stat. 1300, 1305–1306 (amending Federal Coal Mine Health and Safety Act of 1969, §§ 104(a), (b) & 105(d)).

Since the Secretary of the Interior, originally the respondent herein, had delegated his adjudicative responsibilities under the 1969 Act to the Board of Mine Operations Appeals, 43 C.F.R. § 4.500(a) (1976), the decision of the Board is properly the subject of this review. The 1977 Act, however, transferred administrative review to the Federal Mine Safety and Health Review Commission, see Federal Mine Safety and Health Amendments Act of 1977, Pub.L. No. 95–164, tit. II, § 201, 91 Stat. 1305–1306 (amending Federal Coal Mine Health and Safety Act of 1969, § 105(d), 30 U.S.C. § 815(d) (1970)); id. tit. III, § 301(c)(1)–(2), 91 Stat. 1318. The Secretary of the Interior remains as respondent because the new law provides that it "shall not affect suits commenced prior to [its effective date] and in all such suits proceedings shall be had, appeals taken, and judgments rendered, in the same manner and effect as if this section had not been enacted . . ." Id. tit. III, § 301(c)(4), 91 Stat. 1319. The only exception is for suits involving investigative functions transferred to the Secretary of Labor, in which case that Secretary is to be substituted as a party. Id. Our suit, however, involves administrative review functions transferred to the Federal Mine Safety and Health Review Commission, supra, and we accordingly deny the joint motion of the Secretary of the Interior and the Secretary of Labor to add the Secretary of Labor as a respondent. See also note 58 infra.

I

Pursuant to the 1969 Act,[4] the Secretary of the Interior promulgated mandatory health and safety standards designed for the protection of coal miners.[5] To ensure compliance with those standards, the Mining Enforcement and Safety Administration (MESA), the authorized representative of the Secretary, made frequent inspections of mines.[6] If a MESA inspector determined that there was imminent danger from a breach of the standards, he issued a withdrawal order requiring removal of all miners from the imperiled area until the hazard disappeared.[7] If, on the other hand, the inspector found disobedience of a standard but no immediate threat to health or safety therefrom, he issued a violation notice fixing a reasonable time for its abatement.[8] That period could be extended, but if it was not and if the violation persisted, a withdrawal order then followed.[9] Such an order could also emit, even without allowance for an abatement period, when there was an "unwarrantable" but not imminently hazardous failure to comply with the standards.[10]

A mine operator aggrieved by either a notice or an order could apply for administrative review.[11] Any necessary investigation was made, an opportunity for a hearing was provided,[12] and review of the administrative decision was available in the courts of appeals.[13] The Act specified civil penalties for noncompliance with its provisions or with health or safety standards formulated thereunder,[14] as to which the operator had the right to a trial de novo in a district court.[15] In the instance of a withdrawal order, the operator could obtain both administrative and judicial review of an inspector's conclusion that an imminently dangerous condition existed.[16] The pivotal question on this appeal is whether operator could also litigate the facts prompting a notice of violation or only the question of the reasonableness of the time allowed for its abatement.

II

Carbon Fuel Company, the intervenor here, operates several short-lived mines in the Appalachian region of West Virginia, including one known as No. 6A, 23 Drift Mine.[17] That facility is three miles distant from Carbon's central bathhouse, which serves a total of six mines in the area.[18] After complaints by miners that, in contravention of the Secretary's regulations, the bathhouse was inconveniently located, a MESA official investigated and issued a notice of violation giving Carbon 30 days to

4. Federal Coal Mine Health and Safety Act of 1969, § 101, 30 U.S.C. § 811 (1970).

5. 30 C.F.R. §§ 70.100 et seq. (1976).

6. Federal Coal Mine Health and Safety Act of 1969, § 103, 30 U.S.C. § 813 (1970).

7. Id. § 104(a), 30 U.S.C. § 814(a) (1970).

8. Id. § 104(b), 30 U.S.C. § 814(b) (1970).

9. Id.

10. Id. § 104(c), 30 U.S.C. § 814(c) (1970). The withdrawal order could issue only after the operator had been given two violation notices within a 90-day period and a finding had been made for each violation that it was caused by unwarrantable failure to comply with the Act.

11. Id. § 105(a), 30 U.S.C. § 815(a) (1970), quoted in text at note 27 infra.

12. Id.

13. Id. § 106(a), 30 U.S.C. § 816(a) (1970).

14. Id. § 109, 30 U.S.C. § 819 (1970).

15. Id. § 109(a)(4), 30 U.S.C. § 819(a)(4) (1970). The new Act may not be so generous. See S.Rep. No. 181, supra note 3, at 46, [1977] U.S.Code Cong. & Admin.News at p. 3445. Under the 1969 Act, issues of fact that were or could have been litigated earlier in review proceedings before a court of appeals were not determinable de novo in the district court.

16. Federal Coal Mine Health and Safety Act of 1969, §§ 105(a), 106, 30 U.S.C. §§ 815(a), 816 (1970).

17. Carbon Fuel Co., No. HOPE 75–800 (administrative law judge July 22, 1975), at 4, Joint Appendix (J.App.) 229.

18. Id.

abate.[19] Carbon resorted to administrative review, claiming that the time allotted for abatement was unreasonable and "that any period of time set for the abatement of such invalid Notice would be unreasonable."[20]

An administrative law judge ruled that he had jurisdiction not only to extend the abatement period but also to vacate the violation notice on the merits, because, in his words, "'any time for abatement is an unreasonable time if no violation exists.'"[21] He then rejected MESA's contention that the bathhouse was not conveniently situated for use by those working in No. 6A, 23 Drift Mine.[22] The Board of Mine Operations Appeals affirmed the initial determination on location without any reference to the question of its jurisdiction to dissolve the notice, as opposed to authority merely to pass upon the reasonableness of the time allowed for correction of the alleged violation.[23] Petitioner, United Mine Workers of America, then came to this court for further review, attacking both jurisdiction and the decision on the merits.[24]

## III

The Federal Coal Mine Health and Safety Act of 1969 set forth in Section 105 the specifications governing administrative review of withdrawal orders and notices of violations.[25] Those provisions drew some rather large distinctions in scope between the two. The Secretary was empowered to grant temporary relief from a withdrawal order but not from the consequences of disobeying a violation notice.[26] In relevant part Section 105(a)(1) also provided:

An operator issued an order . . . or any representative of miners in any mine affected by such order or by any modification or termination of such order, may apply to the Secretary for review of the order. . . . An operator issued a notice . . . or any representative of miners in any mine affected by such notice, may, *if he believes that the period of time fixed in such notice for abatement of the violation is unreasonable, apply to the Secretary for review* of the notice . . . . [A]n opportunity for a public hearing [shall be provided] at the request of the operator or the representative of miners in such mine, to enable the operator and the representative of miners in such mine to present information relating to the issuance and continuance of such order or the modification or termination thereof *or to the time fixed in such notice.*[27]

If this were the sole statutory directive concerning administrative review of orders and notices, we would be inclined—simply on the basis of the plain language of this section—to accept petitioner's contention that the only permissible challenge to a notice was one calling into question the reasonableness of the time for abatement. Section 105(a)(1) clearly differentiated withdrawal orders and violation notices: one affected by an order in any way could seek "review of the order,"[28] while one aggrieved by a violation notice could apply for review only "if he believe[d] that the period of time fixed in the notice for abatement of the violation [was] unreasonable."[29] And while in the case of an order

---

19. *Id.* at 4–5, J.App. 229–230.

20. Application for Review and Motion to Expedite Hearing and Decision at 2, J.App. 6.

21. *Carbon Fuel Co., supra* note 17, at 7, J.App. 232, quoting *Freeman Coal Mining Corp.*, 1 I.B.M.A. 1, 27 (1970).

22. *Id.* at 7–10, J.App. 232–235.

23. *Carbon Fuel Co.*, 6 I.B.M.A. 20 (1976).

24. Because of our disposition of the jurisdictional issue, we do not reach petitioner's contention concerning the existence of a violation.

25. Federal Coal Mine Health and Safety Act of 1969, § 105, 30 U.S.C. § 815 (1970).

26. *Id.*

27. *Id.* § 105(a)(1), 30 U.S.C. § 815(a)(1) (1970) (emphasis supplied).

28. *Id.*

29. *Id.*

a litigant could "present information relating to the issuance and continuance of such order or the modification or termination thereof," [30] in the instance of a notice his offering was limited "to the time fixed in such notice." [31]

█ Section 105, however, continued in subsection (b) in a somewhat ambiguous fashion:

Upon receiving the report of . . . investigation, the Secretary shall make findings of fact, and he shall issue a written decision, incorporating therein an order vacating, affirming, modifying, or terminating the order, or the modification or termination of such order, or the notice, complained of and incorporate his findings therein. [32]

That, considered alone, was susceptible to a reading empowering the Secretary to "terminat[e]" a "notice," an event which could logically occur only if the notice were reviewed on the merits. Statutory provisions are to be construed, however, not in isolation but together with other related provisions. [33] So treated, Section 105(b) could much more readily be interpreted as authorizing only such relief from orders and notices as was consistent with the highly specific directions in Section 105(a)(1) as to the issues respectively raisable upon challenges to the one or the other.

## IV

Since perhaps we cannot with complete safety rest the statutory limits of administrative review upon the statutory text alone, we turn to the legislative history for guidance to the congressional intent, [34] and find that the history is fortunately unambiguous. The precursor of the 1969 statute, the Federal Coal Mine Safety Act of 1952, [35] while providing for administrative and judicial review of withdrawal orders, furnished no vehicle whatsoever for review of violation notices. [36] Similarly, in the legislative process leading to the 1969 Act, neither the bill initially passed by the House [37] nor that first approved by the Senate authorized review of notices of violation. [38] When, however, those bills—which in other respects differed—left the hands of conferees on behalf of the two chambers, the text of the review provisions of Section 105 emerged. [39] And the Conference Report delineates the scope of jurisdiction afforded by the 1969 review mechanism: it "provide[d] in Section 105(a) for review *solely* of the reasonableness of the time fixed in [the] notice." [40] The legislative history thus evidences plainly enough a congressional purpose to open up to review only a single narrow question regarding violation notices.

If any further indicium of that intent were necessary, it would be found in the

30. *Id.*

31. *Id.*

32. *Id.* § 105(b), 30 U.S.C. § 815(b) (1970).

33. See *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525, 532–533 (1975), citing *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009, 1013 (1849); *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374, 381 (1974), citing *Brown v. Duchesne,* 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595, 599 (1857).

34. See, *e. g., First Nat'l Bank v. Walker Bank & Trust Co.,* 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343, 349 (1966); *United Shoe Workers v. Bedell,* 165 U.S.App.D.C. 113, 118, 506 F.2d 174, 179 (1974); *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 316, 486 F.2d 375, 383, *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1973); *National Petroleum Refiners Ass'n v. FTC,* 157 U.S.App.

D.C. 83, 100, 482 F.2d 672, 689, *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1973).

35. Act of July 16, 1952, ch. 877, 66 Stat. 692.

36. *Id.,* 66 Stat. 699–702.

37. S. 2917, reprinted in Senate Comm. on Labor and Public Welfare, 94th Cong., 1st Sess., Legislative History of the Federal Coal Mine and Safety Act of 1969, at 1402–1438 (Comm. Print 1975) (hereinafter cited as "Legislative History").

38. S. 2917, Legislative History 782–912.

39. S. 2917, Legislative History 1445–1506.

40. H.R.Rep. No. 91–761, 90th Cong., 2d Sess. 69 (1969); U.S.Code Cong. & Admin.News 1969, p. 2503, Legislative History 1513 (statement of House managers) (emphasis supplied).

section-by-section analysis of the Conference bill, which Senator Williams—one of the sponsors of the Senate bill and a Conference Committee manager—introduced into the Congressional Record during the post-conference Senate debates. Addressing Section 105, the analysis states:

Subsections (a), (b), and (c) establish a procedure for reviewing administratively withdrawal orders issued by an inspector, modifications or terminations of such orders by an inspector, and *the reasonableness of the time limits in notices. .* . [41]

This passage not only confirms our understanding of the Conference Report's use of the word "solely," [42] but like its progenitors it makes no reference to the possibility that a notice could be vacated or otherwise terminated on the merits.

■ Against this array of historical data, the Secretary can point merely to an administrative interpretation by the Board of Mine Operations Appeals to the effect that the notice-review provisions authorize some measure of consideration of violation notices on the merits. Several years ago, in *Freeman Coal Mining Corporation,* [43] the Board, without any discernible analysis of the problem, said:

We accept, at least for purposes of the issues presently before us, the proposition that any time for abatement is an unreasonable time if no violation exists. [44]

While the Secretary correctly notes that courts normally accord great weight to administrative construction of the statute administered, [45] such interpretations forfeit their entitlement to deference when they plainly conflict "with other indicia of the proper interpretation of" the statute. [46] As we have seen, the words of Section 105(a), [47] viewed in the strong light of the straightforward legislative history, [48] argue irresistibly the other way.

■ Moreover, were we to read the review provisions as the Secretary urges, we would effectively obliterate the distinction which Section 105(a)(1) plainly made between administrative review of withdrawal orders and of violation notices. [49] It would have made no sense at all for Congress to have separately and differently articulated the scope of review of orders and notices if they were to be precisely the same. Particularly against the backdrop of the legislative history, we cannot assume that Congress intended its distinction to have no meaning. [50]

---

**41.** Legislative History 1603 (emphasis supplied).

**42.** See text *supra* at note 40.

**43.** *Supra* note 21.

**44.** *Freeman Coal Mining Corp., supra* notè 21, 1 I.B.M.A. at 27. That proposition was accepted "for purposes of the issues presently before" the Board. *Id.* The Board reasoned only that "the Act itself nowhere expressly precludes review of the fact of violation," *id.* at 28, yet the proper question is not how much jurisdiction was precluded but how much was conferred.

**45.** See, *e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165 (1971); *United States v. City of Chicago,* 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9, 12–13 (1970); *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 619 (1965).

**46.** *General Elec. Co. v. Gilbert,* 429 U.S. 125, 143, 97 S.Ct. 401, 411–412, 50 L.Ed.2d 343, 358 (1976); accord, *Laborers' Local 1057 v. NLRB,* 186 U.S.App.D.C. 13, 22, 567 F.2d 1006, 1015

(1977) ("[w]hile we respect an administrative agency's interpretation of a statute that it is entrusted with enforcing, in the end the paramount deference must be extended to Congress itself") (footnote omitted).

**47.** See text at notes 25–27 *supra.*

**48.** See text at notes 34–42 *supra.*

**49.** See text at notes 27–31 *supra.*

**50.** See *American Horse Protection Ass'n v. Department of Interior,* 179 U.S.App.D.C. 246, 253, 551 F.2d 432, 440 (1977).

The Secretary also contends that the Supreme Court in *National Independent Coal Operators Ass'n v. Kleppe, supra* note 1, ruled that an operator could obtain administrative review on the merits of a violation notice. All the Supreme Court said was that "[u]nder § 105, 30 U.S.C. 815, an operator may apply to the Secretary for review of the factual basis of any order or notice issued under § 104, or for review of the amount of time allowed for abatement of violations." 423 U.S. at 391, 96 S.Ct.

## V

To be sure, the interpretation we ascribe to Section 105(a) could have worked some hardship on a mine operator who received a notice of violation but believed that he was in full conformity with the Act. He then would have been compelled either to abate the condition or to await transformation of the notice to a withdrawal order by a failure to abate, at which point he would have finally been entitled to challenge the existence of the violation.[51] On the other hand, a contrary construction would simply have transferred the hardship to the miners, and with a much more emphatic impact. Since a withdrawal order automatically removed miners from the area of the alleged health and safety violation, even prolonged review at that time of the order on the merits did not leave them at peril. When, however, only a notice had issued, review of the fact of violation would have subjected the miners to continuing their labors—perhaps for a substantial period—under conditions which, though not thought to be imminently dangerous,[52] were nonetheless believed to be unwholesome and in contravention of the Act's health and safety standards.[53]

In any event, the decision where the hardship should fall was one for Congress to make,[54] and, unconstitutionality aside,[55] neither we nor the Secretary has the prerogative to alter it. Congress made its choice clear when, in staking out goals for the 1969 Act, it solemnly declared that "[t]he first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource— the miner . . . ."[56] That priority was reflected in the Act's review provisions, which did not tolerate either temporary relief from notices of violation [57] or, as we now hold, review on the merits of the violation charged while miners continued to work in the affected area. Only when the miners had been removed, or after the violation had been abated and civil-penalty proceedings instituted, did the operator become entitled to challenge the existence of conditions allegedly trespassing upon the Act. That, we think, was Congress' decree, and we must respect it.

The order of the Board of Mine Operations Appeals is reversed and the case is remanded [58] for further proceedings consistent with this opinion.

*Reversed and remanded.*

at 811, 46 L.Ed.2d at 584. The Court in that case was not specifically considering the breadth of review allowed. We are unwilling to assume that this casual description was intended as a definitive interpretation of the scope of permissible review.

The Secretary also points to two decisions, *Lucas v. Morton,* 358 F.Supp. 900 (W.D.Pa. 1973) (3-judge court), and *Lucas Coal Co. v. Interior Bd. of Mine Operation Appeals,* 522 F.2d 581 (3d Cir. 1975), and argues that they conflict with the conclusion we reach. To the extent that those courts differ in their interpretation of the review provisions, we must respectfully disagree. See also *Kanawha Coal Co. v. Andrus,* 553 F.2d 361, 363 (4th Cir. 1977) (noting, without criticism, "the position of the Secretary that" administrative review extends to "whether a violation existed . . . and whether the time for abatement fixed by that notice was reasonable").

51. See Federal Coal Mine Health and Safety Act of 1969, § 105(a), 30 U.S.C. § 815(a) (1970).

52. See *id.* § 104(b), 30 U.S.C. § 814(b) (1970).

53. See also S.Rep. No. 181, *supra* note 3, at 30, [1977] U.S.Code Cong. & Admin.News at p. 3430 ("[t]he Committee believes that rapid

abatement of violations is essential for the protection of miners").

54. See, *e. g., Barnes v. Costle,* 183 U.S.App. D.C. 90, 101 n. 81, 561 F.2d 983, 994 n. 81 (1977).

55. Because no issue has been raised concerning the constitutionality of the statutory scheme, we do not pass on it here. But see *Lucas v. Morton, supra* note 50.

56. Federal Coal Mine Health and Safety Act of 1969, § 1, 30 U.S.C. § 801(a) (1970). See also *UMW v. Kleppe, supra* note 1, 174 U.S.App. D.C. at 330–331, 532 F.2d at 1405–1406.

57. See note 26 *supra* and accompanying text.

58. As we noted earlier, note 3 *supra,* the Board of Mine Operations Appeals no longer exists and the Secretary of the Interior no longer is responsible for administrative review in this field, but pursuant to the new law we retained the Secretary as respondent. Although we are thus technically remanding to the Secretary, under the 1977 Act further proceedings to comply with this opinion will automatically take

place before the Federal Mine Safety and Health Review Commission. See Federal Mine Safety and Health Amendments Act of 1977,

