DAWN MINING COMPANY, Plaintiff,

v.

James G. WATT, et al., Defendants.

Civ. A. No. 82–1103.

United States District Court, District of Columbia.

July 14, 1982.

Arthur Lazarus, Jr., John T. Boese, Kenneth J. Vandevelde, Washington, D. C., for plaintiff.

Dale White, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM ORDER

HAROLD H. GREENE, District Judge.

In September, 1964, Dawn Mining Company executed certain mineral leases with the Spokane Tribe of Indians for the mining of uranium in the State of Washington. These leases were issued and approved by the Secretary of the Interior in accordance with 25 U.S.C. §§ 396 et seq. Pursuant to these leases Dawn has for many years conducted mining operations at premises known as the Midnite Mine.

In 1976, it submitted and obtained approval of a mining plan under regulations codified at 25 C.F.R. § 177.7 and 30 C.F.R. § 231.10, and in March, 1979, changes were made in that plan describing operations in Pit 3 (which produces high-grade ore) and Pit 4 (which produces only low-grade ore).[1] Two years later Dawn advised the Indian Tribe that it was shifting entirely to Pit 3,[2] and the following month, a notice of non-compliance was issued charging failure to comply with the previously-approved mining plan and ordering Dawn to stop its activities at the mine. Dawn failed to comply, and it took an appeal.

On September 30, 1981, an order was issued by the Interior Department's Deputy Conservation Manager requiring Dawn immediately to cease mining, milling, and processing of ore removed from Pit 3. The order further stated that it would remain effective until Dawn submitted and received approval of a revised mining plan that addressed a number of "concerns," or questions, relating to its changes in operations. Dawn ignored this order as well, did not respond to the questions, and continued to mine and mill ore from Pit 3.[3] On April 20, 1982, the Deputy Assistant Secretary for Indian Affairs issued a final agency decision affirming the September 30, 1981 order and denying Dawn's request for a stay. Two days later, Dawn filed the present action.[4] Presently pending before the Court are plaintiff's motion for summary judgment and the Secretary's motion for partial summary judgment.[5]

30 C.F.R. § 231.73 authorizes a suspension (1) if the mine operator fails to comply with the requirements of an approved mining plan and (2) such failure threatens immediate, serious, or irreparable damage to the mineral deposits. It is convenient to discuss these two elements in inverse order.

It is clear that Dawn's actions threaten serious and irreparable injury to the mineral deposits. As indicated, Dawn unilaterally decided in March, 1981, notwithstanding its previous plans and schedules, to confine its operations strictly to Pit 3. It is also apparent that it is to be a likely consequence of this decision that, as soon as the

1. High-grade and low-grade ore may be mixed during further processing.

2. Dawn proposed to combine this ore with low-grade ore previously stockpiled.

3. However, operations were suspended in November due to winter weather conditions.

4. At the Secretary's request, and after Dawn had declared that it would resume operations notwithstanding the Secretary's order, the Court on May 28, 1982, issued a temporary restraining order enjoining Dawn from resuming mining at Pit 3. The temporary restraining order has been voluntarily extended by the parties pending the Court's decision on the present motions.

5. The issue that is not raised by the summary judgment motions relates to the government's counterclaim for certain penalties.

high-grade ore from Pit 3 is exhausted, Dawn will abandon the site, and the remaining low-grade pits (Nos. 4N and 2W) will never be mined.

■ Low-grade ore is largely useless unless high-grade ore is available with which it may be blended. Yet Pit 3, upon which Dawn is planning to concentrate to the exclusion of all other mining operations, is the only source of high-grade ore in the mine. Dawn's own brief (Memorandum, p. 26) acknowledges that its intention to mine ore from Pit 4N and Pit 2W depends upon an improvement in the uranium market about 1983–84.[6] The Secretary was therefore entirely justified in concluding, as he did on September 30, 1981, that Dawn "has every motivation to high grade and gut the mine rather than manage it and plan for its long range future."[7] If allowed to proceed, Dawn may well deplete the one high-grade pit, leaving the Indian Tribe with the worthless low-grade pits. This is serious and irreparable damage.[8]

Dawn argues that, however that may be,[9] the Secretary cannot satisfy the first prong of the section 231.73 test—that of showing that the operator failed to comply with an approved mining plan. This argument basically hinges upon a claimed distinction between a mining *plan* and a mining *schedule*,

Dawn contending that the former does not include the latter, and that accordingly it may change its mining schedules at will, without seeking or obtaining the approval from the Secretary.

The parties have advanced conflicting arguments on the issue of whether or not the regulation by its own terms, or when read in conjunction with other regulatory provisions,[10] includes a mining schedule in the concept of a mining plan, and it is possible, on the basis of the language itself to support either conclusion.

■ With the issue being in that posture, the Court is persuaded that it should follow the Secretary's interpretation for two reasons. First, it is well established that the administrative construction must be accorded great weight unless it is clearly unreasonable or erroneous. See, *e.g., United Mine Workers of America v. Andrus,* 581 F.2d 888 (D.C.Cir.1978); *Kennedy for President Committee v. FCC,* 636 F.2d 432 (D.C. Cir.1980). Second, it appears to have been the consistent practice of the Department of the Interior in its administration of federal and Indian mining leases to require that mining plans include detailed mining schedules as integral parts of such plans.[11] Indeed, Dawn itself submitted a schedule with its plan when in 1976 it sought the

6. This, of course, is wholly speculative. Indeed, as of March 30, 1982, Dawn had already announced a deferral of its mining plans for Pit 2W from 1982–83 to 1985.

7. Administrative Record, p. 168. One of the "concerns" expressed in the September 30, 1981, order to which Dawn did not reply was how it intended to ensure that it would "not abandon mining operations at the Midnite Mile as soon as the presently identified high-grade ore at Pit 3 is exhausted?"

8. It has aptly been said that by law, "the principal goal of the Department of the Interior in Indian oil and other mineral resource management is ... to assist Indian landowners in deriving maximum economic benefit from their resources consistent with sound conservation practices." F. Cohen, *Handbook of Federal Indian Law,* (1982 ed.) pp. 735–36.

9. Dawn also contends that to require it to mine pits 4N and 2W as a prerequisite to its mining of Pit 3 will injure it economically. However, the Secretary determined in his April 20, 1982,

decision that the short-term solvency of the mine could be maintained without seriously jeopardizing the future marketability of the lower grade deposits. Dawn has consistently refused to submit any revised plan that satisfied the concerns expressed by the Secretary but has insisted on proceeding on the basis of its own plan. In any event, the regulation deals with injury to the mine and the mineral deposits, not with injury to the operator.

10. *E.g.,* section 231.10(a), (c).

11. See affidavit of Andrew V. Bailey. Dawn has moved to strike the Bailey affidavit and similar papers filed with the Court by the Secretary. That motion is not well taken and will be denied. The Bailey affidavit, while outside the administrative record, was filed in response to arguments made by Dawn which themselves went beyond the record. That affidavit, moreover, merely confirms the Secretary's original theory and does not inject a new issue beyond the scope of the administrative decision.

Department's approval of its intended operations. In short, by departing from the previously-approved plan, Dawn was in violation of section 231.73.[12]

■■■ For these reasons, the Court concludes that the decision of the Secretary with respect to Dawn's mining operations was not arbitrary, capricious,[13] or plainly unreasonable,[14] and that it should therefore be upheld.[15]

Accordingly, it is this 13th day of July, 1982,

ORDERED plaintiff's motion for summary judgment be, and it is hereby denied except to the extent that it requests exclusion of its milling operations from the suspension order, and it is further

ORDERED That plaintiff's motion to strike be and it is hereby denied, and it is further

ORDERED That defendant's motion for partial summary judgment be and it is hereby granted except to the extent that it seeks validation of the Secretary's order with regard to plaintiff's offsite milling operations, and it is further

ORDERED That the parties shall appear at a status call on July 27, 1982, at 9:45 a. m. to consider further scheduling with respect to defendants' counterclaim.

12. Additionally, it may be noted that section 231.31(a) of the regulations requires that mining operations shall be conducted so as "to yield the ultimate maximum recovery of the mineral deposits" consistent with environmental concerns. It would appear that Dawn's abandonment of the low-grade pits also violated this provision which is explicitly designed to protect "mineral deposits that at a future date may be of economic importance."

13. See, e.g., Lead Industries Assn. v. EPA, 647 F.2d 1130, 1145 (D.C.Cir.1980).

14. Dawn also argues that the proceeding is tainted by ex parte contacts between the Indian Tribe and lower-level decision-makers in the Department. However, the September 30, 1981 order was issued pursuant to 30 C.F.R. § 321.73(c) which authorizes the suspension of

operations without prior notice. After that order was issued, Dawn was provided with the Tribe's information, it was given six months in which to frame replies, and these replies were fully considered. See *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950).

15. Dawn is correct, however, in its contention that there is nothing in the regulations which allows the Secretary to suspend its offsite milling activities, whatever powers he may have with respect to milling generally (see *e.g.*, section 231.50) or his general suspension powers with respect to mining. See section 177.3(e) which confines the Secretary's general authority to onsite processing.